The State of Ohio, Appellee, *v.* Bradley, Appellant.

[Cite as State *v.* Bradley (1989), 42 Ohio St. 3d 136.]

(No. 87-1985—Submitted February 7, 1989—Decided May 10, 1989.)

138

*Lynn A. Grimshaw,* prosecuting attorney, and *R. Randolph Rumble,* for appellee.

*Randall M. Dana,* public defender, *Randall L. Porter* and *Kathleen A. McGarry,* for appellant.

DOUGLAS, J. The case before this court presents a number of issues for our determination. (See Appendix, *infra.*) We have considered appellant's propositions of law, independently weighed the aggravating circumstances against mitigating factors and considered whether the penalty imposed in this case is disproportionate to penalties imposed in similar cases. Upon review; and for the reasons that

follow, we uphold appellant's conviction and affirm the sentence of death.

## I

Appellant's first proposition of law states that the trial court erred when it admitted the entire investigative report compiled by investigator Teets. Appellant argues that the lengthy report, which consisted of, among other things, statements of witnesses, inmates and corrections officers; psychological reports not helpful to appellant; and a complete list of appellant's prior criminal record, contained numerous items damaging to appellant that would not have been admissible if offered independently as evidence. Therefore, appellant contends, the court erred to appellant's detriment by admitting the report as a whole when it contained numerous inadmissible parts.

The court of appeals refused to hold that the trial court erred in admitting the report because appellant's trial counsel failed to object to its admission, thereby waiving any error. We agree. This court has held that the doctrine of waiver is applicable, even in capital cases. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 260, 15 OBR 379, 397, 473 N.E. 2d 768, 788; *State* v. *Jester* (1987), 32 Ohio St. 3d 147, 150, 512 N.E. 2d 962, 966.

Appellant admits that no objection was made at trial but urges this court to undertake a plain-error analysis, pursuant to Crim. R. 52. This court, however, has held that "* * * [n]otice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State* v. *Long* (1978), 53 Ohio St. 2d 91, 7 O.O. 3d 178, 372 N.E. 2d 804, syllabus. This case does not present a situation requiring this analysis, particularly given the fact that appellant's trial counsel, after ample time to reflect, consciously refused to object to the report's admission into evidence. Appellant's first proposition of law is, therefore, overruled.

In his twenty-first proposition of law, appellant claims that the trial judge abused his discretion by allowing James Patterson to testify. This claim is based on the fact that Patterson had been judicially declared incompetent.

Evid. R. 601 states in pertinent part that:

"Every person is competent to be a witness except:

"(A) Those of unsound mind, and children under ten (10) years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly * * *."

At the point in the proceeding where Patterson was to testify, appellant's counsel did not have in their possession a copy of the record declaring Patterson incompetent. Therefore, the trial judge questioned Patterson to determine Patterson's competence as a witness.

Appellant claims the judge erred in not waiting for the records of Patterson's incompetence to arrive because a declaration of incompetence is *prima facie* evidence of unsoundness of mind and the burden falls to the party offering the witness to show competence. We disagree. Showing the witness to be of unsound mind does not automatically render him incompetent to testify. This court, in *State* v. *Wildman* (1945), 145 Ohio St. 379, 31 O.O. 5, 61 N.E. 2d 790, paragraph three of the syllabus, stated that:

"A person, who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation

of an oath, is a competent witness notwithstanding some unsoundness of mind."

When the trial judge questioned Patterson in his chambers, Patterson's unsoundness of mind was, in essence, presumed, with the trial judge attempting to evaluate Patterson's ability to perceive the events in question and his ability to understand the oath to which he would be sworn.

Appellant further contends that the questioning of Patterson undertaken by the trial judge was inadequate. This argument is based on the assertion that Patterson never demonstrated a true understanding of an oath or an understanding that punishment was the consequence of violating this oath.

The issue raised by appellant is difficult for this court to determine due to the limitations of appellate review. We have not seen or heard the witnesses. We are confined solely to the record itself. Absent a clear-cut abuse of discretion, we are reluctant to second-guess the evaluation of a witness' competency made by the trial judge, who has spoken to the witness and evaluated his demeanor. "The competency of an insane person to testify as a witness lies in the discretion of the trial judge and a reviewing court will not disturb the ruling thereon where there is no abuse of discretion." *State* v. *Wildman, supra,* at paragraph two of the syllabus.

It is not a novel idea to recognize that the trial judge is best suited to pass on the competency of a witness. In *Barnett* v. *State* (1922), 104 Ohio St. 298, 135 N.E. 647, which involved a determination as to whether certain children were competent witnesses, this court stated that " '[t]he trial judge, who saw the children and heard their testimony and passed on their competency, was in a far better posi-

tion to judge their competency than is this court, which only reads their testimony from the record * * *.' " *Barnett, supra,* at 301, 135 N.E. at 648 (quoting court of appeals' opinion). Also, as in *Barnett,* we find nothing in the record to indicate the trial judge abused his discretion in declaring Patterson to be competent to testify.

Though Patterson's credibility as a witness was rightfully subject to attack on cross-examination, the determination of his competency as a witness lay within the sound discretion of the court. A trial judge, being in the best position to view and hear a witness and being in the best position to determine the witness' understanding of the events in question and his understanding of the nature of an oath, is to be given wide discretion in determining that witness' competence to testify. Since no abuse of that discretion was shown, appellant's twenty-first proposition of law is without merit.

Appellant's most serious charges, raised in his second, tenth, thirty-third and forty-first propositions of law, are that he received ineffective assistance of counsel throughout pre-trial proceedings, voir dire, guilt phase and sentencing phase of the trial, in violation of appellant's Sixth and Fourteenth Amendment rights, as well as his rights under Section 10, Article I, Ohio Constitution. After reviewing all of these charges, we do not agree.

"When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by

counsel's ineffectiveness." *State* v. *Lytle* (1976), 48 Ohio St. 2d 391, 396-397, 2 O.O. 3d 495, 498, 358 N.E. 2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910. This standard is essentially the same as the one enunciated by the United States Supreme Court in *Strickland* v. *Washington* (1984), 466 U.S. 668.

After much discussion, the *Strickland* court set forth the standards to be used in judging whether counsel has been ineffective and whether a criminal defendant has been prejudiced thereby. As for ineffectiveness, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland, supra,* at 687-688. The court recognized that there are "* * * countless ways to provide effective assistance in any given case. * * *" *Id.* at 689. Therefore, the court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential. * * *" *Id.* In addition, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Id.* Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance.

Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. *United States* v. *Morrison,* 449 U.S. 361, 364-365 (1981)." *Strickland, supra,* at 691. To warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* at 694. In adopting this standard, it is important to note that the court specifically rejected lesser standards for demonstrating prejudice.[1]

The *Strickland* case also gives further guidance to courts in determining whether a criminal defendant has been prejudiced by counsel's ineffectiveness:

"* * * [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a per-

---

[1] "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet the test, cf. *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 866-867 (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. Respondent suggests requiring a showing that the errors 'impaired the presentation of the defense.' Brief for Respondent 58. That standard, however, provides no workable principle. Since any error, if it is indeed an error, 'impairs' the presentation of the defense, the proposed standard is inadequate because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding." *Strickland, supra,* at 693.

vasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors of the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 695-696.

Accordingly, to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.

With these standards of review clearly enunciated, the only remaining task is to apply these standards to the facts of this case. Before doing so, however, we note *Strickland's* admonition that it might not always be necessary to engage in an analysis of both counsel's effectiveness and the prejudicial impact of any of counsel's errors:

"Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness

claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.* at 697.

With this admonition in mind, we review individually the claims of ineffectiveness of appellant's counsel.

In appellant's thirty-third proposition of law, it is alleged that appellant's counsel were ineffective during voir dire. First, appellant contends that he was completely denied effective counsel as to five jurors, who expressed an inability to vote for the death penalty under any circumstances, because appellant's counsel made no effort to "rehabilitate" these jurors. In essence, appellant argues that counsel should have tried to demonstrate that these jurors could still follow the court's instructions. By counsel not doing so, appellant alleges that he was denied any effective counsel.

Appellant's argument is unpersuasive. Counsel were present for voir dire and could see and hear the jurors answer questions. Appellant's counsel were in a much better position to determine if the jurors could be "rehabilitated" than is this court. This is within the scope of acceptable practice envisioned in *Strickland.*

In fact, none of the complaints made by appellant about his counsel's performance during voir dire is persuasive. All the alleged errors — asking "yes" or "no" questions, not questioning certain veniremen, too few questions to some veniremen, failing to ask questions about pre-trial publicity — fall "within the wide range of rea-

sonable professional assistance." *Strickland, supra,* at 689. None of these errors meets the test for ineffective assistance of counsel. Accordingly, appellant's thirty-third proposition of law is without merit.

In appellant's tenth proposition of law, he claims that his counsel rendered ineffective assistance in the sentencing phase of the trial. Appellant claims that his counsel completely failed to make any mitigation investigation, and that appellant was prejudiced thereby. Toward this end, appellant relies on this court's decision in *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 24 OBR 282, 494 N.E. 2d 1061. In *Johnson,* however, the court stated that mitigating factors could have been discovered and the record also indicated that counsel in *Johnson* undertook absolutely no investigation for the penalty phase of the trial. In the case now before us, appellant's counsel had the forensic report of Dr. Helm and Philip Paulucci, as well as the testimony of Dr. Helm. Counsel clearly attempted to use the report and testimony to bolster the mitigating factor of appellant's mental defect. This was a legitimate strategy given the circumstances. Appellant also argues that his counsel's closing argument was too brief, passionless and themeless. It is nearly impossible for a reviewing court to discern the amount of emotion or feeling the argument showed. Appellant has not shown, in view of the totality of the circumstances, that his counsel's assistance was ineffective. For this reason, appellant's tenth proposition of law is overruled.

The other two propositions of law that argue ineffective assistance of counsel, the second and forty-first propositions, both deal with the police report of the investigation of Bowling's death which was compiled by investigator Teets. The second proposition of law also complains of counsel's lack of investigation and other conduct during the trial. In reviewing these alleged errors, we are convinced that counsel's actions were either permissible trial tactics or not prejudicial.

Appellant argues that counsel's failure to make an opening statement and counsel's closing statement during the guilt phase which purportedly failed to humanize defendant and emphasized the nature of the crime constituted ineffective assistance of counsel. Given, however, the "strong presumption" that counsel's performance constituted reasonable assistance, counsel's actions must be viewed as tactical decisions and do not rise to the level of ineffective assistance. In any event, appellant does not show that there is a "reasonable probability" that but for counsel's actions, the result of the case would have been different. Therefore, the burden of proving prejudice has not been met.

In addition, appellant alleges that his counsel either acted or failed to act on matters concerning the case, thereby rendering ineffective assistance. Appellant alleges that his counsel did not know the answer to a question counsel asked inmate King. Appellant does not, however, indicate how this prejudiced his case. Appellant notes that his counsel introduced no evidence to support appellant's insanity defense. Appellant fails to note that psychological testing was inconclusive because appellant did not cooperate. It was certainly a legitimate strategic choice on counsel's part not to point out this lack of cooperation.

Appellant also argues that counsel should have requested jury instructions admonishing the jury to disregard the shackles worn by appellant

in the courtroom and to avoid news accounts of the crime or the trial. In addition, appellant argues that counsel should have requested an order to compel discovery. Appellant fails, however, to prove that these alleged errors prejudiced his case. Absent such a showing, it is unnecessary to even consider whether counsel's actions constituted ineffective assistance.

Appellant next alleges that it was ineffective assistance for his counsel not to object to the admission into evidence of the police report compiled by Teets. This extensive report contained, among other things, statements of witnesses and prison personnel, copies of newspaper articles about Bowling's death and appellant's arrest, a complete list of appellant's prior record with references to appellant's sentence of death for a prior murder and a copy of a psychological evaluation performed on appellant.

It is appellant's contention that counsel's not objecting to this report, which appellant contends is replete with otherwise inadmissible information, constituted ineffective assistance. We decline to answer this question because, given the facts and evidence, appellant was not improperly prejudiced by the report's admission.

For example, the report contained the statement of inmate Michael L. Steele, who refused to testify at trial. Steele's statement tended to show prior calculation and design on appellant's part. This is not prejudicial, however, because other evidence of prior calculation and design existed and was admitted. Accordingly, we do not conclude that it is reasonably probable that, but for Steele's statement, appellant would not have been convicted.

This same analysis holds true for the listing of appellant's prior criminal record. This might have been prejudicial had appellant not taken the stand and told the jury about his entire criminal record.[2] The listing of the criminal record contained in the report only mirrored evidence in the record. Therefore, no showing of prejudice is made.

Also arguably damaging to appellant were references in the report to his prior death sentence. We do not believe that this rises to the necessary level of prejudice. To hold otherwise would be to conclude that it is reasonably probable that after hearing evidence that appellant committed the murder and that he had previously been convicted of a murder and was confined in a penal facility when the latest incident occurred, the jury found appellant guilty and recommended the death sentence solely because the police report indicated that appellant had previously been sentenced to death. We do not find this conclusion justified.

Looking at the police report in its entirety with due regard to the other evidence in the record, we find nothing that convinces us to a reasonable probability that the result of this trial would have been different if the police report had been excluded. The proposition of law pertaining to the police report is overruled.

The last facet of appellant's ineffective assistance of counsel argument has to do with counsel's failure to con-

---

[2] Appellant also contends that putting him on the stand and having him recite his criminal record, which even contained offenses that the prosecutor could not have inquired about, demonstrated ineffective assistance of counsel. We do not agree. Given the previously stated strong presumption that counsel acted properly, counsel may have had a logical strategic reason for following this course.

duct pre-trial investigation. We do not agree with appellant's contention that counsel's failure gave rise to a presumption of prejudice necessitating a reversal of appellant's conviction.

It is axiomatic that effective representation of a client carries with it a burden to investigate. "* * * [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland, supra,* at 691. See, also, *Powell* v. *Alabama* (1932), 287 U.S. 45.

To appellant, our determination of his counsel's relative effectiveness on this issue is especially important. Appellant contends that a lack of reasonable investigation gives rise to a presumption of prejudice. Toward this end, appellant cites our decision in *Johnson, supra,* in which we reversed a conviction and death sentence because, among other reasons, counsel conducted no investigation of his client's background prior to the mitigation phase of the trial. See, also, *United States* v. *Cronic* (1984), 466 U.S. 648.

If we were to read the record of this case as appellant would have us do, the argument of a presumption of prejudice would be valid. The presumption of prejudice, however, arose in *Johnson* because "* * * [i]n *Johnson,* the record showed a complete failure to investigate. * * *" *State* v. *Gillard* (1989), 40 Ohio St. 3d 226, 235, 533 N.E. 2d 272, 281. We do not, appellant's protestations to the contrary notwithstanding, believe the record indicates that appellant's counsel *completely* failed to undertake a pre-trial investigation.

It is undisputed that appellant's counsel did not interview any of the witnesses called by the state. However, this could easily have been a considered choice of counsel, given both appellant's admission of guilt to the corrections officers and his long history of mental instability. In fact, counsel did diligently pursue the question of appellant's mental stability. Appellant, at the insistence of counsel, was evaluated by Dr. Litvak. Though found competent to stand trial, appellant was also diagnosed as suffering from mental illness. This evidence was used by counsel on appellant's behalf in pleading not guilty by reason of insanity. While counsel may have been more diligent, we do not find that, in this case, the lack of further diligence affected the outcome in any way.

Without a presumption of prejudice, the prejudice standard of *Strickland* applies. As with the police report, we do not believe, given the evidence in the record, that counsel's failure to interview the witnesses before trial gives rise to a reasonable probability that the trial result would have been different had the interviews taken place.

It is argued by appellant that, at the very least, the cumulative effect of the alleged errors proved to be prejudicial to appellant's case. Again, we disagree.

As we have previously stated, the test for prejudice must be conducted in light of the evidence in the record. The case before us consists of a record replete with evidence that appellant committed the crime, with prior calculation and design, while imprisoned for the murder of another. The alleged errors constituting ineffective assistance of counsel, even when viewed cumulatively, do not, in our view, show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been differ-

ent." *Strickland, supra,* at 694. For all the foregoing reasons, appellant's second and forty-first propositions of law are not well-taken.

In proposition of law number sixteen, appellant objects to the introduction into evidence of three pictures of the decedent. Appellant contends that the pictures are gruesome and prejudicial. This court has stated, however, that photographs, even if gruesome, are admissible as long as the photographs' probative value outweighs their prejudicial effect. *State* v. *Maurer, supra,* at paragraph seven of the syllabus. Given our holding in *State* v. *Apanovitch* (1987), 33 Ohio St. 3d 19, 514 N.E. 2d 394, in which a significantly large number of gruesome photographs were deemed to have a probative value which outweighed their prejudicial effect, and given the state's duty to prove all aspects of the case, we find that the probative value of the three pictures admitted in this case outweighed their prejudicial impact. Accordingly, appellant's sixteenth proposition of law is not well-taken.

In a similar vein, appellant, in proposition of law seventeen, complains of the testimony of Officer Larry Smith in which he graphically described the condition of Bowling's body. We do not agree that the statement was inadmissible because, as Evid. R. 403 requires for exclusion of evidence, the probative value of the statement was not substantially outweighed by the danger of unfair prejudice. Therefore, this proposition of law is not well-taken.

## II

In *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568, we held that on issues that have previously been argued and decided by this court, we will give summary disposition in all subsequent cases. We do so with several issues herein.

Appellant's eighteenth proposition of law takes issue with prosecutorial comments and jury instructions which indicate that the jury's recommendation of death is not binding on the trial judge. Citing *Caldwell* v. *Mississippi* (1985), 472 U.S. 320, appellant argues that such a comment or instruction reduces the jury's sense of responsibility.

This argument has been considered and rejected by this court in several cases. See *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795; *State* v. *Rogers* (1986), 28 Ohio St. 3d 427, 28 OBR 480, 504 N.E. 2d 52; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383. We are not persuaded to change our position. Therefore, the eighteenth proposition of law is not well-taken.

Appellant's thirty-fifth proposition of law alleges it was error to admit the entire psychiatric report, prepared at appellant's request, in the mitigation phase of trial. We held in *Buell, supra,* at 138, 22 OBR at 215, 489 N.E. 2d at 808, that if a defendant decides to expose himself to a presentence investigation, the jury should have access to all information in the investigatory report. The appellant herein is not allowed to pick and choose which portions of the report should go before the jury. This proposition of law is not well-taken.

The thirty-seventh proposition of law concerns the trial court's jury instruction with regard to avoiding bias, sympathy or prejudice toward appellant. This court has repeatedly approved just such an instruction. *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, paragraph three of the syllabus; *Steffen, supra,* at 125, 31 OBR at 285, 509 N.E. 2d at 396; *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 86, 512 N.E. 2d 611, 619.

Appellant's contention is without merit.

In proposition of law thirty-nine appellant contends that Ohio's sentencing scheme prevents the jury from deciding whether the death sentence is appropriate. This issue had been raised previously and decided adversely to appellant's position. *Buell, supra,* at 136, 22 OBR at 213-214, 489 N.E. 2d at 806-807. This proposition of law is not well-taken.

Proposition of law forty alleges that the trial judge's decision was based on non-statutory aggravating factors, in violation of R.C. 2929.04(A). We do not agree. This court has stated that a trial judge "* * * may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 99-100, 512 N.E. 2d 598, 604. See, also, *State* v. *Jester* (1987), 32 Ohio St. 3d 147, 153, 512 N.E. 2d 962, 969. Moreover, assuming that the trial court improperly weighed the aggravating circumstances against the mitigating factors, independent review by the court of appeals and this court cures any error. *State* v. *Holloway* (1988), 38 Ohio St. 3d 239, 242, 527 N.E. 2d 831, 835. Appellant's proposition of law is without merit.

Appellant's forty-third proposition of law alleges that the proportionality review that this court must conduct in capital cases is fatally flawed. This contention has been previously rejected by this court. *Steffen, supra,* at 122, 31 OBR at 283, 509 N.E. 2d at 394. We are not persuaded that this position should change. This proposition of law is not well-taken.

Appellant's forty-fourth proposition of law attacks the constitutionality of this state's statutory provisions concerning the death penalty. We have repeatedly held Ohio's death penalty statutes to be constitutionally valid. *Jenkins, supra; Steffen, supra,* at 125, 31 OBR at 285-286, 509 N.E. 2d at 396; *Maurer, supra.* Appellant's contention is without merit.

## III

In regard to appellant's remaining propositions of law, after careful review of the record and case law, we fail to detect any errors that compromise the integrity and reliability of the trial court's findings. Consequently, all of appellant's remaining propositions of law are not well-taken.

## IV

Having completed our review of appellant's propositions of law, our next task is to independently weigh aggravating circumstances against mitigating factors.[3] Appellant presented two mitigating factors to the court, the diminished capacity provision of R.C. 2929.04(B)(3) and the catchall provision of R.C. 2929.04(B)(7), placing emphasis on the probability that if appellant were to be given a life sentence, he would, because of his advanced age, not live long enough to be eligible for parole and release.

During the penalty phase, appellant presented Dr. David Helm as his sole witness. Dr. Helm testified that appellant suffered from chronic paranoid schizophrenia, which was characterized by auditory hallucinations and delusions. It was admitted, however, that no data existed to support a connection between this mental illness and the attack on Bowling.

Due to appellant's lack of coopera-

---

[3] Statutory mitigating factors are set forth in R.C. 2929.04(B).

tion, Dr. Helm had no conclusion as to whether appellant was without substantial capacity to appreciate the criminality of his conduct or to conform it to the law. The best Dr. Helm could offer was his own speculation. In view of this testimony, the mitigating circumstance of R.C. 2929.04(B)(3) was not established.

Similarly, consideration should be given under R.C. 2929.04(B)(7) to the probability that appellant will never be released from prison if sentenced to life in prison. The weight of this consideration is minimized substantially, however, by the fact that appellant was in a penal institution when this attack occurred. Returning him to this environment will do nothing to protect the safety of guards, supervisors, and inmates with whom appellant would have daily contact.

In conclusion, the aggravating circumstances of which appellant was found guilty, a prior murder and his status as a prisoner, are clearly shown by the record. These aggravating circumstances outweigh, beyond a reasonable doubt, the mitigating factors presented.

Our final task is to determine whether the sentence is proportionate to those handed down in similar cases. This court has approved the death penalty in a case involving murder by a prisoner in a detention facility. *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 512 N.E. 2d 585.

We do not find the circumstances of the case before us to be materially different. Therefore, the sentence imposed in this case is not disproportionate.

In conclusion, we find appellant's extensive list of propositions of law to be without merit. Further, we find the aggravating circumstances of the crime outweigh, beyond a reasonable doubt, any mitigating factors, and that the sentence imposed was proportionate and appropriate. Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES and RESNICK, JJ., concur.

WRIGHT and H. BROWN, JJ., dissent.

WRIGHT, J., dissenting. I heartily concur with Justice Brown's dissent in its entirety. I must say that I have mixed emotions about this case since I happen to believe that a murder committed while one is incarcerated should lead to a speedy demise of the culprit in accordance with law. Both deterrence and retribution would be served by this course of action. A review of the two-hundred-eighty-five-page "investigative report" admitted into evidence as the result of the gross incompetence of counsel most certainly strengthens my personal feelings as aforesaid.

However, I feel that my duty as a judge requires a course of decision-making which will protect the constitutional rights of every person, regardless of his or her station in life. This obligation does not stop even when confronted with a vicious individual such as Bradley.

I suggest that no fair-minded person—be he layman or lawyer—could reasonably conclude that Bradley's counsel properly represented their client at trial. Likewise, the "report," which Justice Brown has dissected in detail, is just about the most prejudicial document I have ever encountered in my nineteen years as a judge, the analysis of the majority to the contrary notwithstanding.

The plain truth of the matter is

that appellant would have been far, far better off remaining silent without anyone "representing" him.

I would invite the members of the United States Supreme Court to review this case.

H. BROWN, J., dissenting. I respectfully submit that the judgment in this case should be reversed and remanded for a retrial as the consequence of three major errors, each one prejudicial. First, the defendant did not have adequate representation at trial. Second, the conviction and sentence are contaminated by the admission of highly prejudicial hearsay. These two errors are related and best understood in combination. Finally, the principal witness for the prosecution had been judicially declared mentally incompetent. His testimony was received by the trial court in violation of established legal precedent.

I

Ineffective assistance of counsel has become an almost generic assignment of error in appeals from conviction in capital cases. The error is frequently asserted in appeals from lesser criminal convictions. Quite properly, we have screened such assertions with some skepticism and in accord with the standards set in *Strickland* v. *Washington* (1984), 466 U.S. 668, the seminal case for measuring the ineffective assistance of counsel claim. However, we cannot and should not ignore the claim when the record demonstrates that the defendant did not receive the representation that the law requires. Put simply, I would reverse and send this case back for another trial because the integrity of the judicial process is called into question by the failings in the trial below.

The Sixth Amendment's guarantee of the right to counsel "is the right to the effective assistance of counsel." *McMann* v. *Richardson* (1970), 397 U.S. 759, 771, fn. 14. In order to see the error in the present case, it is necessary to look in detail at the facts. An adequate picture cannot be gleaned from the summaries offered in the majority's opinion.

In going to the specifics, the failure of representation at trial can be broken into three categories: (1) failure to prepare for trial, (2) consent (probably as the result of lack of preparation) to the admission of outrageous, improper and damning hearsay evidence, and (3) failure to present *any* opening argument to the jury.

A. Failure to Prepare

"* * * [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland* v. *Washington, supra,* at 691.

Our facts are these. Approximately *thirty* inmates were in the room where the killing took place. Some of these thirty claimed to be eyewitnesses. In addition, a number of guards arrived on the scene immediately after the killing. The record indicates that defense counsel *did not interview a single inmate or guard* prior to trial.[4]

A failure to interview the basic

---

[4] During a mid-trial suppression hearing concerning Bradley's confession, defense counsel stated:

"MR. RODEHEFFER: I'll call my first witness. I have to rely a certain amount on the prosecution's knowledge of this case,

witnesses is devastating in a case where the death penalty may be imposed. Knowledge of the information possessed by the thirty or more basic witnesses was essential to formulating trial strategy, to presenting the best available defense.

Clearly, failure to interview any of the eyewitnesses violates Standard 4-4.1 of the ABA Standards for Criminal Justice. That standard requires counsel to "* * * conduct a prompt investigation of the circumstances of the case and to explore *all* avenues leading to facts relevant to the merits of the case * * *." (Emphasis added.) I American Bar Association Standards for Criminal Justice (2 Ed. 1980) 4-53.

The majority asserts that this "could easily have been a considered choice of counsel * * *." In a capital case, especially one in which the defendant took the stand to proclaim his innocence, what consideration justifies a failure to interview the fact witnesses? Though the majority skirts the point, the record reveals two explanations which were offered by trial defense counsel: (1) he did not have time to interview witnesses because he received the long list of potential witnesses from the prosecutor only one month before trial, and (2) the prison would not allow access to the inmates without the inmates' permission. Neither explanation is exculpatory. Our task is not to allocate blame among the defense counsel, prosecutor and prison authorities. Our duty is to measure the consequence of going to trial in a capital case without interviewing the witnesses. Defense counsel did not seek a continuance to extend the time for trial preparation. Nor did he interview the detention officers. Surely those witnesses were available. If inmate witnesses were unavailable, a challenge to the prison policy should have been made in court.

### B. Consent to the Admission of Inflammatory Hearsay

The question of adequate representation does not end with the almost total lack of preparation by counsel prior to trial. Because counsel had not interviewed the witnesses and thus could not offer favorable facts through direct testimony, they made the ill-advised choice of allowing a two-hundred-eighty-five-page "investigative report" to be admitted into evidence. The report is hearsay and is excluded under Evid. R. 803(8). Much of the information is irrelevant pursuant to Evid. R. 401. The report is inflammatory. Just how ill-advised was the decision to let this report into evidence may be seen from a look at its contents. These specifics were placed before the jury:

1. The defendant's entire criminal record dating back to 1945.[5]

---

since I haven't interviewed any of these gentlemen. I would like the name of the corrections or police officer who has heard the conversation or was involved in the interrogation or strip search of these prisoners out there.

"THE COURT: And you will call him as a witness?

"MR. RODEHEFFER: I'll call him or I'll call everybody in the Prosecutor's office until I find the witness."

[5] Bradley's criminal record included the following:

1. 5-23-45: violation of fire ordinance. Fined $32.70.

2. 8-17-45: burglary and theft. Served three years and ninety days.

3. 2-25-49: disorderly conduct. Discharged the following day.

4. 12-11-49: disorderly conduct and contributing to the delinquency of a minor.

2. A psychological evaluation of the defendant which reveals these incidents:

a. "He allegedly stabbed another inmate in May, 1947."

b. "[A]ssault upon another inmate 'under unusual circumstances' in January, 1954. * * *"

c. "[H]e cut another inmate * * *."

d. "[A]n unprovoked assault on another inmate in August, 1963."

e. "[I]n February, 1972 he attempted to assault an officer with his fists. His statement at this time was, 'Just putting a lion in the cage and jugging at him. After getting out of that cage you have to have revenge. I did hit him a few times when I came out.'"

f. "[O]n November 22, 1982, apparently without any provocation, he assaulted a female visitor, unknown to him, with a 2 by 2 stick. Later, he was to say that this was simply the result of an accumulation of frustration and also because he wanted closer security as he had previously requested."

g. "[A] report of January 5, 1965 in which allegedly Bradley, without any provocation, plunged into the Death Row shake down area and struck another inmate."

h. The defendant's prior murder offense is graphically depicted: "This offense seems to have involved an argument with another man at a card game. Bradley seems to have been drinking and felt that he had been cheated. He left the game and returned with a shotgun and killed the man although his statement is that the man lunged at him. In 1977 Bradley told us that he did not feel that he was guilty of this charge because the victim had taken his money."

i. "Dr. Alpers * * * described him as surly and refusing medication. He felt that Bradley would 'fight at the drop of a hat.' * * * Bradley * * * developed a belligerent attitude toward everyone connected with the institution."

j. "In February, 1972 there was the incident in which he struck at an officer and made the comment that he felt like an animal who had been caged and had to have revenge. The real issue seems to have been that Bradley wished [to be given] psychotropic medication and he became enraged when the officer did not make immediate arrangements for this."

k. "Bradley admitted to heavy drinking * * *."

l. "He has demonstrated dangerousness to others both in the institutions and in civilian life."

m. "[H]is social orientation is probably dyssocial and condones

---

5. 7-29-52: theft of mail. Sentenced to two years.

6. 10-22-52: possession of stolen mail and forgery. Sentenced to two years.

7. 12-6-54: storehouse breaking. Sentenced to two years.

8. 10-4-58: grand larceny.

9. 5-6-59: storehouse breaking. Sentenced to one year.

10. 1-7-63: "inv. c/w cutting."

11. 5-22-63: First degree murder. Sentenced to death.

12. 12-11-81: carrying a concealed weapon.

13. 3-12-82: having a weapon while under a disability. Sentenced to one and one-half to five years.

In addition, Bradley's record included the dates of Bradley's transfers from one institution to another. Each listing repeats the original charge. For example, first degree murder is relisted on 7-19-65, the date of Bradley's transfer to a Lima hospital, and possession of stolen mail and forgery are relisted on 8-29-53 and 1-12-54. The record is difficult to understand and the transfer dates could easily be mistaken for new charges.

violence in the solution of interpersonal frictions."

n. "Mr. Bradley chooses to justify his actions by externalizing responsibility onto harassments which he perceived as coming from outside of him. He has demonstrated a ready ability to justify his actions in the past. He justified his previous murder offense by saying that the victim cheated him and therefore his action of killing the victim was not wrong. In 1972 he justified an attempted assault upon an officer by saying that he had been locked in a 'cage.' In November, 1982 he justified an assault upon a female visitor by citing accumulated frustration. Now, he justifies the most recent action as resulting from frustration, also, 'The pot boiled over.' There is no need to justify unless there is some sense of choice and some sense of responsibility."

o. "[T]he examiner is not convinced, even though a major psychiatric disorder is present, that Mr. Bradley's consciousness and ability to assess his environment is [sic] so impaired that he would have known that such actions were wrong."

p. "[T]he examiner is not convinced that Mr. Bradley was devoid of control over his actions. He chooses to justify them and he has demonstrated the ability to maintain acceptable behavior for periods of time in the past. The question is one of degree, and the present examiner cannot say with any precision how much Mr. Bradley's impulse control was impaired."

3. Newspaper clippings, given to the jury, contained the following:

a. "Bradley * * * was sentenced to the electric chair 21 years ago for killing a man he accused of cheating him out of $1."

b. "[The] sentence [of death] was changed in 1972 to life in prison."

c. "A prayer vigil" was held for Bowling (the victim) who "had never had problems with inmates in the past," according to the prison superintendent.

4. A notation by Officer Teets that "Howard * * * will testify how good [sic] Eric [the victim] treated inmates."

5. Information that Bowling was married.

6. A notation that "[inmate] Limle said he really liked Eric and would have helped him if he had seen what was going on."

7. A tape recording of Bradley's refusal to talk with law enforcement officers about the incident.

8. A report that Officer Teets "read Inmate Bradley his constitutional rights. Inmate Bradley said he didn't have anything to say. * * * I read the waiver to him and when I read the waiver he then refused to sign the form. * * *"

9. A report stating "[t]his officer * * * interviewed * * * Bradley at Chillicothe Correctional Institute. Bradley was not advised of his constitutional rights during this interview. During the interview Bradley would use phrases such as 'All people, the whole world.' He would not answer questions directed specifically toward him with a specific denial. * * *

"Bradley would not admit that he killed Mr. Bowling nor did he deny killing Mr. Bowling. Bradley started saying he would 'Take the fifth' when questions were asked. * * *"

10. The written statement of inmate Steele: "The day before I started working full-time in the Sheet Metal Shop I was walking by Mr. Bowling's desk and Mr. Bowling was sitting alone at his desk. Mr. Bowling told me to go tell Bradley that starting tomorrow Bradley and I would start working full time in the Sheet Metal Shop.

154

Bradley was sitting on a wooden bench near the painting area and I walked over and told Bradley he would start working full time tomorrow. Bradley came off the bench and said 'Who told you to tell me this.' Because of his voice and the way he came off the bench I could see he was upset. I told Bradley "The short bald headed guy, the boss.' I then said to Bradley 'If you don't want to work 8 hours then you should explain it to your supervisor.' I then walked away from Bradley.

"I then went over and told Mr. Bowling that Bradley seemed fairly upset about this and maybe he should talk to Bradley about it. * * *"

11. The written statement of inmate Patterson: "* * * The day before this happened I saw Eric and Inmate Bradley by Eric's desk. Eric told Bradley to do his work over. Bradley got upset and pointed his finger at Eric and said 'I'm going to get you.' I don't [know] why Eric told him to do his work over. * * *

"Bradley was loud when he said to Eric, 'I'm going to get you.' Eric did not say anything back to Bradley."

12. A report by Officer Teets following inmate Allen's written statement: "When I had Allen read the statement, he wanted the sentence 'he would go to his job early and I told him he wasn't getting paid extra for going in early but he just wanted to' removed. Allen said this sounded like Bradley was planning the killing and Allen likes Bradley and wouldn't want this said against him. The sentence was marked out."

13. The written statement of Corrections Officer Smith: "* * * I heard today that Inmate Leszyeski may have overheard Bradley and Eric argueing [sic] prior to the killing."

14. The written statement of Corrections Officer Taylor: "When I finished with the inmate I was check-ing I looked at Bradley and said to Mr. Seth, 'He looks as nervous as a whore in church.' I think I told Bradley to come up to the table, which he did. Bradley gave me his shirt and I found 2 or 3 stains on the front that I thought were blood. I said to Bradley 'What's this?' I reached the shirt out and pointed to the stains. Bradley said 'Blood from the Foreman.' Bradley spoke king [sic] of low. I said to Bradley 'What did you say?' Bradley said to me 'The Foreman's blood.' It shocked me when he said that so I said 'Did you do it?' Bradley answered 'Yes I did it.' * * * Someone yelled something at Bradley as we were going down the hall but I don't know who it was. I think Bradley said something about 'this going back a long time.' * * *"

15. Officer Teets' notation that "Bradley was asked how he learned that he was going to work full time in the shop. Bradley said an inmate told him he was going to work full time. This would corroborate what inmate Steele has said. * * *"

16. Officer Teets' notation that inmate Patterson "will tell the truth to questions he is asked. * * *"

17. Statements from key prosecution witnesses that they were willing to take polygraph tests.

18. The written statement of inmate McCoy: "* * * I saw Inmate Bradley had a piece of metal raised above his head and he was holding it with both hands. Bradley hit Eric with the metal and I saw Eric fall to the floor. * * * Bradley hit Eric 3 or 4 times after he fell and I tried to stop Bradley. I kind of pushed Bradley and told him he didn't want to do that. Bradley raised the metal as if to hit me so I got away from him. * * *"

19. The written statement of inmate Jennings: "Lather[n]s told me Bradley was involved and that two

white guys saw it and had told on Bradley. * * *"

20. The written statement of inmate Latherns: "It really shocked me that Bradley did this. * * *"

21. The written statement of inmate Ankney: "King had told me Bradley had killed Eric * * *."

22. The written statement of inmate Mills: "Someone said they didn't want involved [sic] in this and Bradley said you don't have to worry. I know what happened and you [sic] not involved."

23. A notation that Rick Taylor asked Bradley, "Did you do this?" and Bradley said he did.

24. The written statement of Corrections Officer Duke: "* * * Rick. Taylor was looking at [Bradley's] * * * blue shirt and Taylor said 'Where did the blood come from.' Bradley said 'That's the foreman's.' After Bradley said that a couple of us said 'Did you do it' in sequence. Bradley said 'Yes, I done it.' * * *"

25. The written statement of Corrections Officer Seth: "* * * Inmate Bradley removed his shirt and a spot of blood was found on it. I asked Inmate Bradley what it was and he said blood. I then asked where it came from and he said over there, & nodded to the area of where Eric Bowling's desk is located at. Officer Richard Taylor then asked Inmate Bradley, 'Did you do it,' and Inmate Bradley replied, 'Yes.' "

26. The written statement of inmate Judon: "* * * Bradley admitted he did it. * * *"

This highly damning evidence was otherwise inadmissible and, thus, was placed before the jury *solely* because trial defense counsel consented. It is no surprise that the jury found the element of prior calculation and design to be present, convicted the defendant of aggravated murder and voted to recommend the death penalty. It

stretches one's imagination beyond the breaking point to describe the information that went to this jury as harmless or nonprejudicial.

The right of an accused to confront and cross-examine the witnesses against him is fundamental. In allowing these hearsay statements into evidence, defense counsel forfeited any chance of establishing a doubt in the minds of the jurors that the defendant purposely killed Bowling. This is especially disturbing because counsel presumably knew, at the time they let the deluge in, that the defendant was going to take the stand and deny having anything to do with Bowling's death.

It can fairly be said that the report contained some information helpful to Bradley which was used by defense counsel in summation and cross-examination. However, the favorable information could have been elicited far more effectively (and without destroying the case) had only the favorable witnesses been called to testify. Counsel could not do that because the witnesses had not been interviewed prior to trial.

Moreover, the record indicates that defense counsel took, at most, *two hours* to review the two-hundred-eighty-five-page report before agreeing to its admission. Defense counsel could not have adequately studied the report. Consider the irony of the following. Defense counsel requested that one item be deleted from the report: the section of Bradley's prior murder sentence which indicated he had been previously sentenced to death. However, that same information was included in at least eight different places in the report which did go to the jury due` to defense counsel's consent. Admission of the report was not the result of careful or deliberate strategic choices.

156

## C. Waiver of Opening Statement

The importance of the opening statement in a criminal defense requires no lengthy elaboration. The principle has been stated thus: "* * * It is generally conceded that, except for short misdemeanor trials without a jury, an opening statement for the defense should never be waived. * * *

"Defense counsel, in opening statement, must reduce the effect of the prosecutor's opening by making the contradictory statement that will cast immediate doubt in the minds of the jurors. The failure to do so may cause some jurors to make up their minds even before the first witnesses have been called.

"If defense counsel is unsure of what course to follow or has some secret defense which she or he does not wish to reveal at the outset of the trial, a superficial opening statement is still preferable to none at all. * * *" Strategies & Techniques in Criminal Defense (2 Ed. 1983) 143-144; see, also, McCloskey & Schoenberg, Criminal Law Deskbook (1988), Sections 15.02 and 15.06(3)(k).

Conceivably, circumstances might exist where waiving the opening statement is sound trial strategy. None is apparent in this case and trial defense counsel did not articulate any. Sadly, it appears that the failure to make an opening statement was the result of the lack of trial preparation. Defense counsel did not know how to argue the evidence that would be admitted against the accused and thus made no argument.

## D. Prejudicial Effect

In certain Sixth Amendment contexts, prejudice is presumed. For instance, "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland, supra,* at 692.

Where, as here, defense counsel fails to interview *any* of the available witnesses to a violent murder, a constructive denial of the assistance of counsel may be established. Cf. *State* v. *Johnson* (1986), 24 Ohio St. 3d 87, 24 OBR 282, 494 N.E. 2d 1061. However, prejudice need not be presumed in this case. It is demonstrable from the record.

The state must, of course, prove every element of a crime beyond a reasonable doubt. Aggravated murder entails a purposeful killing done with "prior calculation and design[.]" R.C. 2903.01(A). Prior calculation and design is a more stringent element than deliberate and premeditated malice. It requires a scheme designed to implement the calculated decision to kill; instantaneous deliberation is not sufficient. *State* v. *Cotton* (1978), 56 Ohio St. 2d 8, 10 O.O. 3d 4, 381 N.E. 2d 190.

The evidence submitted to the jury on the issue of prior calculation and design consisted of the physical layout of the metal shop, inmate Patterson's testimony at trial, and the hearsay testimony from the two-hundred-eighty-five-page report. The most persuasive evidence of prior calculation and design is that contained in this report.

A twenty-foot distance existed between the victim and the scrap metal stockpile from which the murder weapon was apparently obtained. Except for the ambiguous testimony of inmate Patterson (see Section II, *infra*), the twenty-foot distance between the murder weapon and the victim was *the only competent evidence* of prior calculation and design. Whether defendant struck out at Bowling in a fit of sudden, unexplained rage or killed Bowling by a prior calculation and design is, on the record (absent the

hearsay report), very much an open question.

The investigative report makes the case on prior calculation and design. It contained inmate Steele's hearsay statement that Bradley was upset with Bowling. Steele refused to testify at trial and was never subject to cross-examination. The report contained Patterson's hearsay statement that Bradley told Bowling, "I'm going to get you." It contained the hearsay-within-hearsay statement of Corrections Officer Smith that "Leszyeski may have overheard Bradley and Eric argueing [sic] prior to the killing." It contained the hearsay statement of Officer Taylor that "Bradley said something about '[t]his going back a long time.'" Finally, the report contained a notation by Officer Teets that inmate Allen, Bradley's cellmate, wanted his written statement changed to remove the sentence "[h]e [Bradley] would go to his job early and I told him he wasn't getting paid extra for going in early but he just wanted to" because "Allen said this sounded like Bradley was planning the killing and Allen likes Bradley and wouldn't want this said against him."

In addition, the report contained much information which, though not directly related to the issue of prior calculation and design, has a large potential for distorting the jury's entire view of the evidence. For example, through the psychiatric evaluation the jury received detailed accounts of violent episodes for which Bradley was never charged and of which he was never convicted, and they were informed that Bradley had previously received the death penalty. "The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule. The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand. * * *" *State* v. *Allen* (1987), 29 Ohio St. 3d 53, 55, 29 OBR 436, 438, 506 N.E. 2d 199, 201.

In sum, the defendant was not adequately represented at trial. *Strickland, supra,* supplies the test. "* * * The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *A reasonable probability is a probability sufficient to undermine confidence in the outcome.*" (Emphasis added.) *Id.* at 694.

"* * * When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. * * *" *Id.* at 695.

"* * * *[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. * * *"* (Emphasis added.) *Id.* at 696.

The deficiencies here may be easier to see from another perspective. Would the public tolerate a prosecutor who, in an aggravated murder case: (1) did not, prior to trial, interview the witnesses? (2) failed to make an opening statement? and (3) consented to the admission of massive inadmissible evidence detailing the despicability of the victim?

## II

The testimony of James Patterson should have been excluded as incompetent.

Evid. R. 601 provides: "Every person is competent to be a witness except:

"(A) Those of unsound mind, and

158

children under ten (10) years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly * * *."

Patterson, who was mentally retarded, had been judicially declared incompetent and placed under guardianship. When the trial judge was informed of this fact, he examined Patterson in chambers to determine his competence to testify.

This court has held it is "inherent in the test of competency" that a witness understand the nature of an oath and the penalties for its violation. *State* v. *Wilson* (1952), 156 Ohio St. 525, 529, 46 O.O. 437, 439, 103 N.E. 2d 552, 555. The trial judge asked Patterson whether he knew what it meant to take an oath. Patterson said: "Well, we tell what happened and what happened in the incident." This response, cryptic at best, leaves it unclear whether Patterson understood that he had a duty to give a *truthful* account of "what happened in the incident." Indeed, *Patterson was not even asked by the judge if he knew the difference between truth and untruth.*

Nor does the record support a conclusion that Patterson understood that punishment would follow if he lied. The judge did not ask Patterson what happens if a lie is told. Instead, he determined that Patterson had attended church and/or Sunday school as a child. However, the fact that a witness has had some Sunday school exposure is not, by itself, enough to show "* * * that he will fulfill the obligation to speak truthfully as a duty which he owes a Diety [*sic*] or something held in reverence or regard * * *." *Hill* v. *Skinner* (1947), 81 Ohio App. 375, 377, 37 O.O. 213, 79 N.E. 2d 787, 789.

The determination of competence does lie in the sound discretion of the trial court. *State* v. *Wildman* (1945), 145 Ohio St. 379, 386, 31 O.O. 5, 8, 61 N.E. 2d 790, 793. Here, however, Patterson's crucial testimony was admitted though the trial court failed to determine whether he "understood right from wrong, whether it is wrong to lie, the consequences of lying, [or] the nature of an oath to tell the truth * * *." *State* v. *Eastham* (1988), 39 Ohio St. 3d 307, 313, 530 N.E. 2d 409, 414. In allowing the testimony without making the proper inquiries, the trial court abused its discretion.

III

Though our Constitution and laws do not guarantee a perfect trial, they do demand a fair trial. This demand reaches its zenith when a person's life is at stake. It is true that society requires punishment for criminal behavior. The defendant in this case is singularly unappealing and his history of conduct is despicable (especially when consideration is given to the otherwise inadmissible descriptions and vignettes which are part of this record). However, there are other important values at stake here. These include the integrity of the judicial process, the conduct of a fair trial and the limitation of the evidence to that which is admissible under established precedent. The process by which this defendant stands convicted and sentenced is unacceptable. Therefore, I respectfully dissent.

WRIGHT, J., concurs in the foregoing dissenting opinion.

Appendix

*"Proposition of Law No. I*[:] The trial court erred when it admitted into evidence the entire two hundred eighty-five page police report which included newspaper clippings, witness

statements, and numerous photographs, in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. II*[:] Appellant was denied effective assistance of counsel in the guilt portion of the trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. III*[:] The prosecutor's failure to provide discovery until twenty-five days prior to the commencement of trial, such discovery containing fifty-five potential witnesses, violated appellant's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution; and Crim. R. 16.

*"Proposition of Law No. IV*[:] The state of Ohio's failure to provide William Bradley with pretrial disclosure of evidence that supported his insanity defense; that the crime was actually committed by Eddie Moss; and that the state of Ohio's pivotal witness was mentally incompetent, violated appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; Sections 10 and 16, Article I of the Ohio Constitution and Crim. R. 16.

*"Proposition of Law No. V*[:] Admission of testimony pertaining to an oral statement obtained from appellant in violation of his constitutional rights under *Miranda* and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution; Sections 14 and 16, Article I of the Ohio Constitution denies him these rights.

*"Proposition of Law No. VI*[:] Information obtained by a state psychologist from an accused without the benefit of *Miranda* warnings should not be admitted into evidence at trial. The admission of this evidence in the present case is a violation of appellant's constitutional rights as guaranteed by the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

*"Proposition of Law No. VII*[:] It is an error to allow the jury to have a tape recorder to listen to a tape of appellant exercising his *Miranda* right to remain silent. This error denied appellant his constitutional rights as guaranteed by [the] Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. VIII*[:] Permitting guard Richard Taylor to testify that appellant appeared 'nervous as a whore in church' violates appellant's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. IX*[:] The trial court erred to the prejudice of appellant when it instructed the jury that it was to find the defendant not guilty only if it determined that appellant 'had nothing to do with the death,' in violation of appellant's rights as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

*"Proposition of Law No. X*[:] Appellant was denied effective assistance of counsel in the mitigation portion of the trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and

160

Section 10, Article I of the Ohio Constitution.

*"Proposition of Law No. XI*[:] The trial court erred when it conducted the mitigation hearing a mere few hours after the completion of the psychological examination and permitted only three days for completion of the psychological examination in violation of appellant's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution and Ohio Revised Code, Section 2929.024.

*"Proposition of Law No. XII*[:] The trial court erred to the prejudice of the appellant when it appointed a psychologist who had previously stated that he could not render an opinion to conduct the mental evaluation of the appellant prior to the mitigation phase of the trial. This error violated appellant's [rights guaranteed by the] Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

*"Proposition of Law No. XIII*[:] The trial court's penalty phase instruction on reasonable doubt shifted the burden of proof to appellant, and allowed the state to prove fewer than every element needed to impose the death sentence in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XIV*[:] The trial court abused its discretion and by doing so erred to the prejudice of appellant, by permitting witnesses to testify as to the character of the victim. Such actions violated appellant's rights as guaranteed by Ohio Evidence Rule 404, the Fifth, Eighth and Fourteenth Amendments to the United

States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XV*[:] It is error to make repeated references to the widow of the victim during voir dire of a capital murder trial thereby violating appellant's constitutional rights as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XVI*[:] The trial court erred to the prejudice of appellant by introducing gruesome and prejudicial pictures into evidence and showing same to the jury when the prejudicial effect of said pictures clearly outweighed the probative value. The effect of this erroneous evidentiary ruling was the denial of appellant's rights to due process and a fair and impartial trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XVII*[:] Allowing a witness to graphically describe the condition of the victim's body [is] a violation of Ohio Rule of Evidence 403 and denies appellant due process and a fair and impartial jury in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XVIII*[:] The trial court and prosecutor's comments to the jury that the jury's verdict as to death was only a recommendation and not binding upon the trial judge violated appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

*"Proposition of Law No. XIX*[:] The trial court erred to the substantial

prejudice of appellant by failing to excuse prospective jurors Hollback, Knore and Wheeler for cause in violation of Crim. R. 24(B)(9), R.C. Sections 2945.25, 2313.42, and 2343.43, Section 10, Article I of the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

*"Proposition of Law No. XX*[:] Failure to permit counsel for appellant to cross-examine the state of Ohio's witness, Michael Steele[,] deprived appellant of his right to cross-examine witnesses as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution [and] Section 10, Article I of the Ohio Constitution.

*"Proposition of Law No. XXI*[:] It is an abuse of discretion to allow a person who has been judicially declared incompetent to testify in a capital murder trial. Appellant was denied due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

*"Proposition of Law No. XXII*[:] It is a violation of Evid. R. 611(C) to allow an attorney to ask leading questions of his own witness on matters of substance in a capital murder trial. This violation denies appellant's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XXIII*[:] It is a violation of Evid. R. 611(A) and R.C. 2945.03 to allow a witness to make a statement unrelated to any material fact of the case. This error deprived appellant of a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XXIV*[:] It is an abuse of discretion to allow the court reporter to read selective sections of testimony of four witnesses to the jury, thereby prejudicing the appellant and denying him due process as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XXV*[:] Prosecutorial argument during mitigation phase which implored the jury to penalize the accused for exercising his constitutional rights denied appellant his right to a fair trial and impartial jury as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XXVI*[:] An appellant has a right to have the admissibility of his statements determined by the trial court and not the jury. Evidence Rule 104 is violated when the jury is allowed to make this determination and appellant [is] denied his due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

*"Proposition of Law No. XXVII*[:] It is error for the trial court to place upon appellant the burden of going forward as to the issue of suppressing appellant's statement, thereby violating appellant's right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

*"Proposition of Law No. XXVIII*[:] It is error to require a person accused of a capital crime to appear in shackles during the trial. This action violated appellant's rights to a fair trial as guaranteed by the Fifth, Sixth and

Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

*"Proposition of Law No. XXIX*[:]* A trial court's instruction that the jury could sentence an accused to death if the crime charged was horrible, bad, shocking to the conscience, awful, heinous, or offensive, violated Ohio law and his right to due process, fair and impartial jury, and against cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

*"Proposition of Law No. XXX*[:]* It is error for the trial judge to inform potential jurors as to his personal opinion concerning when the death penalty was appropriate as such comments violate appellant's rights as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXI*[:]* Comments to prospective jurors concerning a radio broadcast are prejudicial to appellant and deny him a fair trial and an impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 5, 10 and 16, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXII*[:]* Failure of the trial court to adequately admonish the jury violates appellant's right to a fair trial by an impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXIII*[:]* The performance of trial counsel during voir dire resulted in a denial of appellant's constitutional right to the effective assistance of counsel and to a fair and impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 5, 10 and 16, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXIV*[:]* It is prejudicial error to disclose in opening statement that the appellant had a prior conviction. This error denied appellant his right to a fair trial by an impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXV*[:]* It is error to admit into evidence, over objection, the entire psychological report which was prepared in the mitigation [phase] pursuant to O.R.C. 2929.03(D)(1) in violation of appellant's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 14, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXVI*[:]* Failure to instruct the jury concerning the appellant's constitutional right not to testify denies appellant's rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of [the] Ohio Constitution.

*"Proposition of Law No. XXXVII*[:]* The court's instruction prohibiting consideration of mercy, sympathy and prejudice in the sentencing decision violated appellant's constitutional rights to due process, equal protection and against cruel and unusual punishment.

*"Proposition of Law No. XXXVIII*[:]* The trial court erred to the prejudice of appellant when it charged the jury that it could consider any factor that it desired in determining the appropriate penalty. This error violated

appellant's rights as guaranteed by the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

"*Proposition of Law No. XXXIX*[:] Ohio's mandatory sentencing scheme prevented the jury from deciding whether death was the appropriate punishment in violation of appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

"*Proposition of Law No. XL*[:] The decision of the trial judge was erroneously based upon non-statutory aggravating factors in violation of Ohio Revised Code, Sections 9 and 16, Article I of the Ohio Constitution and the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and failed to consider all evidence presented in mitigation in violation of appellant's constitutional rights under *Lockett* v. *Ohio* and *Eddings* v. *Oklahoma*.

"*Proposition of Law No. XLI*[:] A defense counsel's failure to preserve error violates appellant's rights to a fair trial and to the effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.

"*Proposition of Law No. XLII*[:] The sentence of death in the present case is inappropriate due to the large number of errors occurring at both the guilt and mitigation phases of trial thereby depriving the sentence of all indication of reliability as required by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution and Ohio Revised Code Section 2929.05.

"*Proposition of Law No. XLIII*[:] The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code, Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code Section 2929.05.

"*Proposition of Law No. XLIV*[:] The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code, Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed requirements, and, thus, are unconstitutional both on their face and as applied to appellant Bradley."