ACCELERATED DOCKET JOURNAL ENTRY AND OPINION
{¶ 1} This cause came on to be heard upon the accelerated calendar pursuant to App.R. 11.1 and Loc.App.R. 11.1.
 {¶ 2} Defendant-appellant, Sundiata Langford, pro se, appeals from the judgment of the Cuyahoga County Common Pleas Court denying his petition for postconviction relief and granting the State's motion for summary judgment regarding his petition. Finding no merit to the appeal, we affirm.
 FACTS AND PROCEDURAL HISTORY {¶ 3} The facts of this case were set forth by this court inState v. Langford, Cuyahoga App. NO. 80753, 2003-Ohio-159, in which we affirmed appellant's convictions. We stated:
 {¶ 4} "On the evening of August 15, 2001, four children were sitting on the front porch with the victim, 13-year-old Warren Culbreath; his 17-year-old sister, his 14-year-old stepbrother, and a 14-year-old friend. As they were chatting and enjoying the evening, they saw an older model, white four-door Chevy stop at the corner of East 120th, the street they were on, and Kelton. The occupants of the white car started shouting at a young man on a bike who was standing on the corner talking to two young women with a baby in a stroller.
 {¶ 5} "The man dropped his bike and ran to 11811 Kelton, a house where he and his friends used to hang out. He testified that he ran for his life because the men in the car asked him whether he was Rockland, and, when he told them he was, they shouted, `You killed my nigger.'
 {¶ 6} "A short time before, a member of the Rockland gang had killed a member of the Bloods. The man stated that he knew the men in the white car were looking for revenge, so he ran to his friend's house and shouted, `The dudes are coming.' He heard the tires squeal as he was running up the driveway, and as he vaulted the backyard fence, he heard gunshots. All three defendants, who were in the house on Kelton, gave the police statements that they grabbed weapons when they heard that the men in the white car were coming. All three admitted firing at the white car.
 {¶ 7} "Meanwhile, when the victim and friend saw the man drop his bike and run, they stepped off the porch and walked toward Kelton to see what was going on. They lost sight of the car when it went further down Kelton. When they heard tires squealing, however, they knew they needed to run for safety, the friend testified. They ran back to the porch, saw the white car run over the abandoned bike on the corner of Kelton and 120th and then turn back on 120th driving toward their house. At this point they heard gunshots; they did not see any guns or gunfire coming from the white car.
 {¶ 8} "As soon as they heard gunshots, the sister, stepbrother, and the victim ran into the house. Their friend was too frightened to leave the porch, so he laid face down on the floor of the porch until the shooting stopped. The victim's stepbrother ran into the house and literally ran into his father, who had rushed up the basement stairs as soon as he heard gunfire. By this time, the shooting had stopped. The sister estimated at trial that the shooting lasted less than twenty seconds.
 {¶ 9} "Gathering the children to make sure they were all right, the victim's stepfather discovered the victim lying part way up the stairs to the second floor. When he looked more closely, he discovered a large bullet wound in the child's back. After the victim's sister called 911, the stepfather took the phone and stated that the boy was shot. The police and EMS arrived shortly thereafter. The boy was taken to Rainbow Babies and Children's Hospital, where he died shortly after arrival.
 {¶ 10} "The autopsy showed that the bullet entered the boy's lower back, traveled up his back, breaking several ribs, and then crossed two areas of his brain. The coroner testified that he would have been paralyzed immediately upon impact. The bullet retrieved from the top of his skull was a 7.62 caliber, which is used in an automatic assault weapon like an AK-47 or M-16. Although the police investigation did not determine the exact trajectory of the bullet, it did determine that the bullet came from the direction of 11811 Kelton.
 {¶ 11} "Because the children associated the shooting with the white car, the police initially investigated the murder as a drive-by shooting. They searched the area for shell casings without success but did find the bullet entry into the house. They discovered that the house next door to the victim's also had bullet holes in a downspout, as well as several broken windows. Again, the police did not determine the exact trajectory of the bullets.
 {¶ 12} "Several days later, the police received an anonymous tip that the shooting came from the Kelton address. They let acquaintances of the defendants know the police wanted to talk to them; all the defendants willingly gave statements prior to being arrested. Each defendant admitted to shooting at the white car but only while the car was still on Kelton, not after it had turned onto 120th. They also stated that the white car's occupants began shooting first. They described their weapons as a .22 hand gun, a .22 rifle, and a .380 handgun. All three told the police that they had given their guns to defendants' friend, from whom the police later recovered only two .22s. The police were never able to recover the .380 the defendant in the case at bar claimed he used in the shooting."
 {¶ 13} After a jury trial, Langford was convicted of murder, with a firearm specification, and sentenced to fifteen years incarceration for the murder, to be served consecutive to three years on the firearm specification, for a total of eighteen years.
 {¶ 14} This court affirmed Langford's convictions on direct appeal. We also subsequently denied his application for reopening. State v. Langford, Cuyahoga App. No. 80753, 2003-Ohio-4173.
 {¶ 15} In September 2002, while his appeal was pending, Langford filed a petition for postconviction relief, pro se, pursuant to R.C. 2953.21. In his petition, Langford argued that he was denied his right to effective assistance of counsel because his trial counsel did not call Darrell Martin to testify as a witness for the defense at trial. In an affidavit appended to Langford's petition, Martin averred that, if called, he would have testified that seconds before the shooting, he saw Langford and his two codefendants running in the opposite direction of the shooting. Martin averred that he had given this information to counsel for one of Langford's codefendants, but was never called to testify at trial.
 {¶ 16} The trial court subsequently granted the State's motion for summary judgment regarding Langford's petition and dismissed his petition without a hearing.
 ANALYSIS {¶ 17} R.C. 2953.21, which governs petitions for postconviction relief, provides in pertinent part:
 {¶ 18} "(A)(1) Any person convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.
 {¶ 19} "* * *
 {¶ 20} "(C) * * * Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of court, and the court reporter's transcript. * * * If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal."
 {¶ 21} In his assignment of error, Langford contends that the trial court committed reversible error in dismissing his petition without first conducting an evidentiary hearing. A hearing is not automatically required, however, whenever a petition for postconviction relief is filed. State ex rel. Jackson v.McMonagle (1993), 67 Ohio St.3d 450; State v. Strutton (1988),62 Ohio App.3d 248, paragraph one of the syllabus. The pivotal concern is whether there are substantive constitutional grounds for relief that would warrant a hearing based upon the petition, the supporting affidavits and materials, and the files and record of the cause. Strutton, supra. A petitioner is entitled to postconviction relief under R.C. 2953.21 only if the court can find that there was such a denial or infringement of the petitioner's rights so as to render the judgment void or voidable under the Ohio or United States Constitutions. State v. Perry
(1967), 10 Ohio St.2d 175, paragraph four of the syllabus. Where a petition for postconviction relief fails to allege facts which, if proved, would entitle the petitioner to relief, the trial court may so find and summarily dismiss the petition. Perry,
supra, paragraph two of the syllabus. In order to establish ineffective assistance of counsel, a defendant must demonstrate that his or her counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that performance. State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus, certioraridenied (1990), 497 U.S. 1011. "Before a hearing is granted, the petitioner bears the initial burden in a postconviction proceeding to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and also that the defense was prejudiced by counsel's ineffectiveness." State v. Jackson (1980), 64 Ohio St.2d 107,111.
 {¶ 22} According to the affidavit submitted with Langford's petition, Martin would have testified at trial that seconds before the shooting, he saw the three codefendants running in the opposite direction of the shooting. Langford contends that this testimony would have "exonerated" him and, therefore, his trial counsel was ineffective in not calling Martin as a witness. We disagree.
 {¶ 23} "In reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact." State v. Calhoun
(1999), 86 Ohio St.3d 279, 284. One of the factors a trial court may consider when evaluating credibility is whether the affidavits contradict evidence proffered by the defense at trial.Calhoun, supra.
 {¶ 24} Here, it is readily apparent that Martin's affidavit is not credible. At trial, Langford and his two codefendants all admitted to shooting in the direction of the white car in self-defense. Thus, Martin's proposed testimony that he saw the three defendants running in the opposite direction immediately before the shooting started directly contradicts the testimony of the three defendants at trial. Accordingly, the trial court did not err in concluding that Martin's affidavit lacked credibility.
 {¶ 25} Moreover, it is readily apparent that even if Martin's testimony had been presented at trial, it would not have "exonerated" Langford. There was significant evidence of Langford's guilt presented by the State at trial: 1) Langford admitted to the police that he fired a weapon in the direction of the white car while he was in front of 11811 Kelton Avenue; 2) the police investigation determined that the bullet which killed the victim came from the direction of 11811 Kelton; 3) a shell casing of the same caliber as the bullet that killed the victim was found several days after the shooting at the home next door to where Langford was shooting; 4) Langford's next-door neighbor testified that the only gunfire she heard came from directly in front of her house; and 5) except for the defendants' testimony, all of the testimony was consistent that no shots were fired from the white car and the gunshots came only after the white car had turned onto 120th. In light of this considerable evidence that Langford or one of his codefendants fired the fatal shot, Langford was not prejudiced by defense counsel's failure to call Martin as a witness.
 {¶ 26} Finally, a defense counsel's selection of witnesses to call at trial falls within the purview of trial tactics. Statev. Coulter (1992), 75 Ohio App.3d 219, 230. Even debatable trial tactics and strategies do not amount to a denial of effective assistance of counsel. State v. Clayton (1980),62 Ohio St.2d 45, 49. As this court stated in our opinion affirming Langford's convictions, "counsel's representation of defendant was far from deficient and did not prejudice defendant. In fact, when reading the transcript of defendant's trial, this court was impressed by counsel's diligence and thoroughness."
 {¶ 27} Nothing in Langford's petition or Martin's affidavit, when considered against the entire record, raises an issue of fact that Langford was denied effective assistance of counsel. Therefore, the trial court did not err in dismissing his petition without an evidentiary hearing.
 {¶ 28} Appellant's assignment of error is overruled.
 {¶ 29} The judgment is affirmed.
Judgment affirmed.
Gallagher and Rocco, JJ., concur.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.