[Cite as *State v. Jackson*, 2009-Ohio-5906.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                    CASE NO. 14-09-24

     v.

ERIC A. JACKSON,                        O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 02-CR-0116

**Judgment Affirmed**

Date of Decision: November 9, 2009

APPEARANCES:

    *Claire R. Cahoon* for Appellant

    *Terry L. Hord* for Appellee

**PRESTON, P.J.**

{¶1}    Petitioner-appellant, Eric A. Jackson (hereinafter "Jackson"), appeals the Union County Court of Common Pleas' judgment denying his petition for post-conviction relief without a hearing.  We affirm.

{¶2}    The pertinent facts and procedural history of this case was set forth by this Court in Jackson's direct appeal, *State v. Jackson*, 3d Dist. No. 14-03-28, 2004-Ohio-4016, appeal not allowed by *State v. Jackson*, 104 Ohio St.3d 1439, 2004-Ohio-7033, 819 N.E.2d 1123, as follows:

> **It is undisputed that on October 15, 2002, Jackson shot his mother, Donna Levan ("Levan"), with a sawed-off twelve-gauge shotgun. The shooting occurred in the parking lot of Levan's place of employment, the Heartland of Marysville Nursing and Rehabilitation Center, in Union County, Ohio. There were no witnesses to the shooting. Following the shooting, Jackson drove away from the scene, but he was shortly thereafter pulled over and arrested by a Union County Sheriff's deputy. Levan died nine days after the shooting.**
>
> **On October 24, 2002, following Levan's death, Jackson was indicted and charged with one count of Aggravated Murder, in violation of R.C. 2903.01(A), a felony of the first degree, with a firearm specification, and Unlawful Possession of Dangerous Ordnance, in violation of R.C. 2923.17, a felony of the fifth degree.**
>
> **Pertinent to this appeal, Jackson entered written pleas of not guilty and not guilty by reason of insanity to the charge of aggravated murder. See Crim.R. 11(A). Jackson was deemed competent to stand trial by the court-appointed psychiatrist and the matter was set for a jury trial.**

> **On June 26, 2003, the jury returned a verdict finding Jackson guilty on all charges. Jackson was sentenced to consecutive prison terms of three (3) years for the firearm specification and twenty (20) years for aggravated murder. Jackson was also sentenced to one (1) year in prison for unlawful possession of dangerous ordnance, to be served concurrently with the aggravated murder conviction. In aggregate, Jackson was sentenced to twenty-three (23) years in prison.**

On August 2, 2004, this Court affirmed Jackson's conviction but reversed and remanded for resentencing finding *sua sponte* that Jackson should have been sentenced to a life term under R.C. 2929.03(A)(1). Id. at ¶¶22-23; (Doc. No. 165).

{¶3} On February 26, 2004, while his direct appeal was pending, Jackson filed a Crim.R. 33(B) motion for a new trial on the basis of newly discovered evidence. (Doc. No. 153). Specifically, Jackson alleged a newly discovered witness, Kaci Chaffin, observed the shooting and averred that Jackson never pointed the gun toward his mother; but "[r]ather, the gun discharged after Jackson aimed the weapon at his own head and his mother struggled to pull the gun away." (Id.); (Id., Ex. A). On March 2, 2004, however, the trial court overruled the motion as being untimely filed. (Doc. No. 157). On March 24, 2004, Jackson appealed this decision, and, on September 27, 2004, we affirmed the trial court's decision. *State v. Jackson*, 3d Dist. No. 14-04-11, 2004-Ohio-5103 (Doc. No. 165), appeal not allowed by *State v. Jackson*, 105 Ohio St.3d 1451, 2005-Ohio-763, 823 N.E.2d 456.

{¶4} On April 16, 2004, after the trial court denied his Crim.R. 33(B) motion for a new trial, Jackson filed a post-conviction petition in the trial court. (Doc. No. 164). In support of his petition, Jackson alleged that his trial counsel was ineffective because he failed to discover Kaci Chaffin, an eyewitness whose testimony would have likely changed the outcome of his trial. (Id.). For unknown reasons though, the trial court failed to rule on the motion. Then, on May 27, 2009, Jackson filed a motion for a ruling on the petition. (Doc. No. 180). On June 22, 2009, the trial court dismissed Jackson's post-conviction relief petition without a hearing. (Doc. No. 181).

{¶5} On July 10, 2009, Jackson filed a notice of appeal from the trial court's decision. (Doc. No. 183). Jackson now appeals raising two related assignments of error. We elect to address them together.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN DISMISSING MR. JACKSON'S POSTCONVICTION PETITION, BECAUSE MR. JACKSON PRESENTED A SUBSTANTIVE GROUND FOR RELIEF IN OFFERING SUFFICIENT EVIDENCE THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL. STRICKLAND V. WASHINGTON (1984), 466 U.S. 668, 687-88; (JOURNAL ENTRY, JUNE 22, 2009).**

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN DISMISSING MR. JACKSON'S POSTCONVICTION PETITION WITHOUT AN EVIDENTIARY HEARING WHEN THE PETITION DEMONSTRATED SUFFICIENT OPERATIVE FACTS TO**

**ESTABLISH SUBSTANTIVE GROUNDS FOR RELIEF. R.C. 2953.21(C); (JOURNAL ENTRY, JUNE 22, 2009).**

{¶6} In his first assignment of error, Jackson argues that he presented substantive grounds for relief by offering sufficient evidence that his trial counsel was ineffective. In his second assignment of error, Jackson argues that the trial court erred by denying his petition without first granting an evidentiary hearing. The State argues that the trial court did not abuse its discretion by denying Jackson's petition without a hearing. We agree with the State.

{¶7} R.C. 2953.21, the post-conviction relief statute, provides, in pertinent part:

> **(A)(1)(a) Any person who has been convicted of a criminal offense * * * who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. * * ***

> **(C) The court shall consider a petition that is timely filed under division (A)(2) of this section even if a direct appeal of the judgment is pending. Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. * * * If the court dismisses the petition, it shall make and file**

**findings of fact and conclusions of law with respect to such dismissal. * * ***

**(G) If the court does not find grounds for granting relief, it shall make and file findings of fact and conclusions of law and shall enter judgment denying relief on the petition. * * ***

{¶8} A petitioner seeking to challenge his conviction through a post-conviction relief petition is not entitled to a hearing automatically. *State v. Jones*, 3d Dist. No. 4-07-02, 2007-Ohio-5624, ¶12, citing *State v. Jackson* (1980), 64 Ohio St.2d 107, 110, 413 N.E.2d 819; *State v. Driskill*, 3d Dist. Nos. 10-07-03, 10-07-04, 2008-Ohio-827, ¶12. Instead, the applicable test is "whether there are substantive grounds for relief that would warrant a hearing based upon the petition, the supporting affidavits, and the files and records in the case." *Jones* at ¶12, citing *State v. Strutton* (1988), 62 Ohio App.3d 248, 251, 575 N.E.2d 466. When reviewing the documentary evidence in support of the petition, the trial court may judge credibility and determine whether to accept the affidavits as true for the purpose of showing substantive grounds for relief. *Jones* at ¶15, citing *State v. Calhoun* (1999), 86 Ohio St.3d 279, 284, 714 N.E.2d 905; *State v. Bays* (Jan. 30, 1998), 2nd Dist. No. 96-CA-118; *Strutton*, 62 Ohio App.3d at 252

{¶9} When the post-conviction relief petition "'alleges grounds for relief, and the record of the original criminal prosecution does not fully rebut the allegations, the petitioner is entitled to an evidentiary hearing in which he is provided an opportunity to prove his allegations.'" *Jones* at ¶13, quoting *Bays*, 2nd

Dist. No. 96-CA-118, citing *State v. Williams* (1966), 8 Ohio App.2d 135, 136, 220 N.E.2d 837. "However, if the court determines that there are no substantive grounds for relief, it may dismiss the petition without an evidentiary hearing." *Jones* at ¶14, citing *State v. Smith*, 3d Dist. No. 1-04-50, 2004-Ohio-6190, citing *Calhoun*, 86 Ohio St.3d at 282-83; *State v. Cole* (1982), 2 Ohio St.3d 112, 443 N.E.2d 169.

{¶10} When a petition for post-conviction relief alleges ineffective assistance of counsel, "the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness." *Driskill*, 2008-Ohio-827, at ¶16, citing *Jackson*, 64 Ohio St.2d 107, syllabus; *Jones* at ¶18. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373, citing *Strickland v. Washington* (1984), 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

{¶11} We review a trial court's denial of a post-conviction petition without a hearing for an abuse of discretion. *Jones* at ¶16, citing *State v. Campbell*, 10th

Dist. No. 03AP-147, 2003-Ohio-6305, citing *Calhoun*, 86 Ohio St.3d at 284. An abuse of discretion implies more than an error of law; rather it connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶12} In support of his petition, Jackson submitted the affidavit of Kaci Chaffin, an alleged eyewitness to the shooting. (Doc. No. 164, Ex. B). Ms. Chaffin averred, in relevant part, that:

1. **\* \* \* On October 15, 2002, I was employed by Heartland nursing home in Marysville, Ohio. \* \* \***
2. **I was acquainted with Donna Levan from working with her. Donna periodically discussed her son, Eric Jackson. She told me that he had drug problems and had attempted suicide.**
3. **Eric Jackson came to Heartland, midday on October 15, 2002. Donna went outside to see him in the parking lot, saying he was probably going to ask her for money.**
4. **I walked down the hallway to continue my work, when Annabelle Reed, a patient, told me I should come to the window and see what was happening in the parking lot between Donna and her son.**
5. **From the window of Ms. Reed's room, I saw Donna fighting with her son. Mr. Jackson had the shotgun pointed to his own head. Donna was trying to pull the shotgun away from him.**
6. **As Donna struggled with her son, the gun discharged and shot her hand off. At no time did Mr. Jackson appear to point the gun at his mother.**
7. **I pulled the curtains closed and went to the bathroom to get sick. I called my grandfather and he picked me up from work soon thereafter.**
8. **I was not aware that anything I saw was significant to the police investigation. I was never approached by the police or anyone else regarding the event.**
9. **In October 2003, I was working at the Millcrest nursing home. I spoke with Barbara Jackson, who I am casually**

> **acquainted with because she sometimes babysat me as a child. She was discussing her husband when I realized that she was married to Eric Jackson. I told her what I saw on the day Donna was shot. In November 2003, I spoke with an investigator from the Ohio Public Defender and recounted the information contained in this affidavit.**

(Id.). Jackson also submitted the affidavit of his trial counsel, Jeffery M. Holtschulte. (Doc. No. 164, Ex. A) Holtschulte averred, in relevant part:

> **2.     That * * * I was assigned through the Union County Public Defender system * * * to represent Eric Jackson, the Defendant in the above captioned matter [State v. Jackson, Case No. 2002 CR 0116];**
>
> **3.     That Mr. Jackson was indicted in this matter on one count of Aggravated Murder and one count of Unlawful Possession of Dangerous Ordinance;**
>
> **4.     That said indictment was based upon allegations that Mr. Jackson, on or about October 15, 2002, shot his mother with a sawed off shotgun in the parking lot of her workplace, Heartland Nursing Home, in Marysville, Union County, Ohio and she subsequently died as a result of the injuries she sustained;**
>
> **5.     That Mr. Jackson indicated that he had no recollection of the actual shooting;**
>
> **6.     That based upon the interviews with Mr. Jackson, his wife, his treating psychiatrist at the time and review of the investigation information provided in discovery, a defense theory was developed and Defendant entered a written plea of Not Guilty and Not Guilty By Reason Of Insanity;**
>
> **7.     That witnesses identified and/or disclosed saw activity immediately before and after the shooting but none stated they saw the actual instant of the shooting;**
>
> **8.     That no action was taken to search for other witnesses that had not been identified, discovered or voluntarily come forward;**
>
> **9.     That I reviewed the affidavit of Kaci Chaffin, dated December 23, 2003, wherein she sets forth that she saw the actual instant of the shooting, but was not aware that what she saw was significant to the police investigation;**

**10. That had Kaci Chaffin been discovered or otherwise identified there is a reasonable probability that her testimony, as set forth in the affidavit, would have altered the theory of defense; she would have been called as a defense witness; and that said testimony would have been resulted in Mr. Jackson not being convicted of Aggravated Murder.**

(Id.).

{¶13} The trial court, in its findings of fact and conclusions of law, found that Jackson's trial counsel did not render ineffective assistance for failing to discover a "reluctant and silent witness." (June 22, 2009 JE, Doc. No. 181). The trial court further found that Jackson's trial counsel "diligently investigated the facts, witnesses, and theories of the case." (Id.). In the alternative, the trial court found that even if trial counsel's assistance was constitutionally ineffective, Jackson was not prejudiced since it was unlikely Chaffin's testimony would have affected the outcome at trial. (Id.). The trial court found that Chaffin's affidavit was not credible because Chaffin's averment that she "was not aware that anything [she] saw was significant to the police investigation" and that she witnessed Jackson shoot his mother's hand off were irreconcilable. (Id.). The trial court further questioned the credibility of Chaffin's affidavit since Jackson's wife was Chaffin's friend and childhood babysitter. (Id.). Therefore, the trial court determined that Jackson was not denied effective assistance of counsel under *Strickland*, and therefore, his constitutional rights were not violated. (Id.).

**{¶14}** After reviewing the trial court's judgment, the affidavits, the record, and all the documentary evidence listed in R.C. 2953.21(C), we cannot conclude that the trial court abused its discretion by dismissing Jackson's post-conviction petition without a hearing. To begin with, we are not persuaded that Jackson was provided ineffective assistance of trial counsel for trial counsel's failure to investigate for potential eyewitnesses outside of the State's provided discovery. Jackson correctly points out that "[c]ounsel has a duty to make *reasonable* investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Jackson's trial counsel averred that he developed a defense theory based upon his interviews with Jackson, Jackson's wife, and Jackson's treating psychiatrist at the time, as well as an investigation of information provided in discovery. (Holtschulte Aff. at ¶6, Doc. No. 164, Ex. A). The State's initial discovery provided: a list of thirty-five (35) potential witnesses that could be called at trial; copies of police reports and narratives; copies of the witness statements; property custody documents; vehicle inventory documents; gunshot residue analysis; inventory of items obtained by search warrant; copies of vehicle identifications; and copies of related press releases and newspaper articles. (Doc. No. 12). The State filed supplemental discovery several times. (Doc. Nos. 16, 19, 34, 40, 58, 62, 63, 66, 86, 103, 113). We believe that trial counsel's decision to review and investigate those witnesses

and evidence provided in the State's discovery filings—and not investigate outside of the evidence contained in these filings—was reasonable in light of all the evidence provided by the State during discovery. Based upon that evidence, trial counsel developed a theory of defense predicated upon Jackson's desire to commit suicide and his alleged mental defect. (June 24, 2003 Tr. at 30); (Holtschulte Aff. at ¶6, Doc. No. 164, Ex. A). "[A]fter counsel chooses an adequate theory of defense, there is no duty to prepare for alternative theories." *State v. Heffernan*, 12th Dist. Nos. CA2005-11-104, CA2005-11-105, 2006-Ohio-5659, ¶15, citing *State v. Hoop*, 12th Dist. No CA2004-02-003, 2005-Ohio-1407, ¶30, citing *State v. Murphy*, 91 Ohio St.3d 516, 2001-Ohio-112, 747 N.E.2d 765. Therefore, we cannot conclude that trial counsel failed to fulfill his duty of conducting a reasonable investigation under *Strickland*.

**{¶15}** In addition, we cannot conclude that Jackson was prejudiced by counsel's failure to discover Chaffin. As an initial matter, we cannot conclude that the trial court abused its discretion by determining that Chaffin's affidavit was not credible. *Jones* at ¶15, citing *Calhoun*, 86 Ohio St.3d at 284; *Bays*, 2nd Dist. No. 96-CA-118; *Strutton*, 62 Ohio App.3d at 252. In assessing the credibility of affidavits, the trial court should consider all relevant factors, *including*:

> **(1) whether the judge reviewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits**

> **contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.**

*Calhoun*, 86 Ohio St.3d at 285. "[O]ne or more of these factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility. Such a decision should be within the discretion of the trial court." Id. The trial court found that Chaffin's relationship with Jackson's wife—a co-worker and childhood babysitter—raised credibility issues (factor 4). We cannot find an abuse of discretion with that conclusion. Furthermore, although not listed among the *Calhoun* factors, we find no abuse of discretion in the trial court's conclusion that Chaffin's statement that she "was not aware that anything [she] saw was significant to the police investigation" is inconsistent with what she averred she witnessed and raises serious credibility issues. (Chaffin Aff. at ¶8, Doc. No. 164, Ex. B). Accordingly, we cannot find that the trial court abused its discretion in finding that Chaffin's affidavit was of questionable credibility.

{¶16} Furthermore, we cannot conclude that Jackson was prejudiced by trial counsel's alleged failure to investigate. The evidence at trial overwhelmingly supported the conclusion that Jackson purposefully killed his mother. Deputy Lonnie Elmore of the Union County Sheriff's Department testified that when he

stopped Jackson driving his car shortly after the shooting, Jackson stated, "I'm the one you're looking for. I'm the one that did it. I threw the gun out the window in the grass." (June 24, 2003 Tr. at 128-30). When Deputy Elmore asked Jackson what he did, Jackson replied, "[s]hot her * * * [m]y mother." (Id. at 132). Sheriff Rocky Nelson testified that he heard Jackson state, "I did it * * * I shot her * * * my mother." (Id. at 145-46).

{¶17} Carla Rees, a Heartland employee who was working when the incident occurred, testified to the following:

> **Q: When you got outside, what did you see?**
> **A: Um, we ran around to Donna's car, and Donna was on the, she was on the ground. There was a guy had a belt around her right arm, and a lady had her shirt on her belly, putting pressure. Her whole right side of her hand was completely blown away. You could see the inside of her hand. Her thumb was barely hanging on the back of her hand. And when I got there, I hollered for some of the staff to go get some blankets to put on her, and I put her legs up, and she said, "Oh my God, I can't believe he would do this, and I said, "Who, Donna?", and she said, "My son, Eric," and she just kept saying, "Oh, my God, I'm going to die, "and I said, "Donna, you're not going to die. You'll be okay."**
>
> **I kept trying to reassure her she wasn't going to die. She said three or four times that she was going to die, and she kept laying there, her head kept going back and forth. "Oh, my God, it hurts so bad." And I assured her, you know, that they were coming to help her, and when the medics got there, they took away that shirt that the lady had on her belly, and she had a big hole in the right side of her stomach, and she had had spaghetti for lunch that day, and it was all over her belly, all over the concrete around her. And she kept getting kind of shocky. She just kept kind of going out, and I kept just trying to help her,**

and she just [sic] saying, "My God, it hurts so bad," you know, "I'm going to die."

\* \* \*

Q:  How many times did you hear her say who shot her?
A:  Twice.  Once before the Chief got there, and then when he got there, he asked her point blank if she knew who shot her. She said, "Yes. My son," and he said, "who is your son?"  She said, "Eric Jackson."

(Id. at 381-84).   Alicia Davis, also a Heartland employee, testified, in pertinent part:

Q:  \* \* \* Did you have occasion to go outside shortly before noon that day?
A:  I went to my van.
Q:  Why did you go to your van?
A:  To get some change out, and to check on an employee that went out there, Donna.
Q:  Okay.  When you went outside, what did you see?
A:  When I went outside, you know, went to my van, and Donna at that time was coming back, somebody she had met in the driveway, and we had met, and we were talking.
Q:  So you saw her head back into the building?
A:  Yeah, at that time.  And so we stood in the driveway and talked about why she was out there, and --
Q:  Okay.  Without going into details of the conversation, did Donna go back inside at that time?
A:  No.
Q:  She stayed outside?
A:  Correct.
Q:  And what did you do?
A:  We talked, and a car pulled up, and she went to the car that was, somebody that, that's who she was going to meet.
Q:  Could you see who was in the car?
A:  I could see just a shape, a shadow, but I couldn't see directly who was in the car.
Q:  What did you see or hear after Donna went up to her car?

**A:** When Donna went to the car, I went to my van, and I could hear yelling, very belligerent yelling, screaming, hollering, the person in the car hollering at her.

**Q:** * * * Did you say you could identify this person as a man?

**A:** It appeared to be a man.

**Q:** Did you hear or see anything else between this person and Donna Levan?

**A:** Yeah. When I heard the yelling going on, I looked out through the windows in my van, and I could see the person in the car grabbing at Donna, and Donna trying to pull away.

(Id. at 389-91).

**{¶18}** Jackson, on the other hand, testified about meeting his mother Donna at Heartland as follows:

**A:** * * * My next memory is coming from a side street -- Heartland is on South Plum Street, which is the main entrance to their property. There is a side street on the other end of the parking lot that is not drawn.

When I got to Heartland, and saw my mom outside, I pulled up to her. She goes, "What do you need?" I said, Well, I said – I've obviously planned to kill myself. I wanted to say goodbye. I am tired of not being able to provide for my family, and I wanted to be on speaking terms when I passed away.

An argument broke out * * *

My memory was obviously first on her own behalf, just trying to get her to understand that I was done, I did not want to move anymore, I was not working, that I wanted to be done.

My rage got to a point that I still was not just getting a simple okay. I remember reaching out, having ahold of my mother's smock jacket, and pulling my hand back, realizing that I haven't touched my mother since I gave her away at wedding December 3, 1986.

I then saw the Mills Center building at the end of the parking lot through a clearing in the trees.

**Q:** Are you familiar with the Mills Center?

**A:** Yes. I had been there for my suicide treatments over the years.

> I was looking at the building. My hands, just as they are now, my left hand on the steering wheel at 10:00 o'clock, my right hand on my gear shift in first gear, wanting to get help.
>
> My mother's argument continued. I focused on getting help. * * *
>
> At the end of my mother's argument I drove away, having a sight on the Mills Center the entire time, even as I drove away. There is no spot in my mind that will black out -- there is no spot in my mind of even touching the gun while I was with my mother.
>
> I drove away. I looked in the rearview mirror as I shifted gears, saw my mother doubled over. I could not pick up my eight-year-old daughter. I was going to jump out of the car because I thought my mother was having a heart attack from this argument, carry her to the Emergency Room. She raised up looking at me with her hand on her belly. I thought she was laughing at me. Got my car back in gear, and drove off, leaving my mother alive and laughing at me.

(Id. at 415-18). Jackson could not recall making any confession to Deputy Elmore and denied making any plans to kill his mother. (Id. at 419, 421, 439). On rebuttal, Dr. Chris Khellaf, a licensed psychologist, testified that he evaluated Jackson and concluded that Jackson had "pseudo-amnesia * * * meaning that it's not true amnesia * * * it is selective forgetfulness, it is fake amnesia." (Id. at 459-60, 480); (State's Ex. 54).

{¶19} In light of the evidence presented that: Jackson admitted to shooting his mother and never claimed it was accidental; Davis' testimony that Jackson was arguing with his mother, and Jackson physically grabbed and pulled his mother toward the car; Jackson's mother's statement that her son shot her and never mentioning that it was accidental or that her son was attempting to commit suicide

when it happened; and the fact that Dr. Khellaf testified that Jackson's amnesia was "fake," we are not persuaded that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 691. Nor is our confidence in the outcome undermined as a result of counsel's alleged shortcomings. *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694. Consequently, Jackson has failed to establish ineffective assistance of trial counsel, and therefore, a constitutional violation upon which post-conviction relief would be warranted. Therefore, the trial court did not abuse its discretion in denying Jackson's post-conviction relief petition without a hearing.

{¶20} Jackson's first and second assignments of error are, therefore, overruled.

{¶21} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**