[Cite as *State v. Jackson*, 2010-Ohio-2297.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,           CASE NO.  14-09-30

     v.

ERIC A. JACKSON,              O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 07-CR-0199

**Judgment Affirmed**

**Date of Decision:  May 24, 2010**

APPEARANCES:

    *Claire R. Cahoon*  for Appellant

    *David W. Phillips*  for Appellee

Case No. 14-09-30

**SHAW, J.**

{¶1} The appellant, Eric A. Jackson, appeals the August 18, 2008 judgment of the Common Pleas Court of Union County, Ohio, finding him guilty of two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), both felonies of the third degree, one count of pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(1), a felony of the second degree, and one count of pandering obscenity involving a minor in violation of R.C. 2907.321(A)(1), a felony of the second degree, and sentencing him to an aggregate prison term of seventeen years.[1]

{¶2} The facts relevant to this appeal are as follows. On October 15, 2002, Jackson was arrested for the shooting of his mother.[2] At the time of his arrest, Jackson was in his vehicle. This vehicle was seized and impounded by the Marysville Division of Police when Jackson was arrested. The vehicle was later processed for evidence, and located inside the vehicle was a gray Craftsman toolbox. Inside the toolbox, investigators found no tools. However, they found handwritten notes to Jackson, two pairs of women's underwear, two videotapes,

---

[1] On August 20, 2009, Jackson filed a motion for leave to file a delayed appeal, which this Court granted on September 16, 2009.
[2] Jackson's mother died nine days after being shot. Jackson was indicted and subsequently convicted of aggravated murder with a three-year firearm specification and sentenced to an aggregate prison term of life with parole eligibility in twenty-three years. See *State v. Jackson*, 3rd Dist. No. 14-03-28, 2004-Ohio-4016, appeal not allowed by *State v. Jackson*, 104 Ohio St.3d 1439, 2004-Ohio-7033, 819 N.E.2d 1123; *State v. Jackson*, 3rd Dist. No. 14-09-24, 2009-Ohio-5906.

and a photo album inside the toolbox. The album contained numerous photographs, mostly of Jackson's wife in sexual positions or states of undress. The album also contained two photographs of Jackson's daughter, who was eight years old at the time of Jackson's arrest, in a state of undress.

{¶3} Detective Douglas Ropp testified that he viewed the videotapes, including what would eventually become State's Exhibit 1. This videotape appeared to be a homemade video. In one segment, Jackson and his daughter, who was born on September 1, 1994, are depicted together in a bedroom. Det. Ropp testified that he had been to Jackson's home on Riverwind Drive in Marysville, Ohio, which he occupied from April of 2001 until the date of his arrest, and that the video segment of Jackson and his daughter was filmed in Jackson's bedroom in that home.

{¶4} This segment of the video showed Jackson's daughter completely nude, walking around the bedroom and sitting on the bed. Jackson, who is wearing only shorts and underwear, has his daughter turn her back to the camera and bend over. He then picks her up and turns her around with her legs spread apart. Both positions enable the camera to capture a close-up image of his daughter's genitalia. After he puts her down, he removes his shorts, leaving him dressed in only his thong underwear. Jackson then sits on the bed, facing the camera, and has his daughter sit sideways on his lap. After patting the side of her

buttocks, he places his entire hand on her left buttock and gropes it. Jackson then turns his daughter on his lap to face towards the camera, lies down on the bed, pulling her with him, and removes his underwear with her still on top of him. He proceeds to return them to a seated position. During this time, Jackson's exposed penis has skin-to-skin contact with his daughter's anal and vaginal area. Shortly after this contact, his daughter gets up and Jackson re-dresses. This videotape was later shown to Jackson's wife, who confirmed that it was Jackson and their daughter on the video and that the video was taken in the bedroom of their Riverwind Drive home.

{¶5} After Jackson's arrest for the shooting of his mother, Jackson and his wife wrote letters to one another. At some point, Jackson's wife wrote a letter to Jackson, asking where the keys were to a footlocker her parents bought for her when she was sixteen. Jackson sent a letter to his wife in response, which stated that he last knew of the keys to the footlocker being in a safe. He then writes, "[i]f nothing else use a fork to pick the lock." The letter continues with Jackson asking his wife to burn a blue disc, marked "Jams," that is in the footlocker, stating "it has pictures even you don't want to see and the explanation sickens me anyway." Jackson also wrote in this letter that he did nothing sexual with their daughter, that he was acting in a maternal way, and that he saw nothing wrong with their

-4-

daughter being undressed with him but that he was wrong by being undressed with her.

**{¶6}** Sometime after receiving this letter, Jackson's wife found the blue disc, marked "Jams," inside the footlocker and looked at its contents. On this disc, she found six photographs of her daughter in a bathtub wearing no clothing. The JPEG file in which the photographs were saved showed a date of July 21, 2001. The disc contained no other photographs.

**{¶7}** In all six of these photographs, some part of Jackson's daughter's genitalia is exposed. In four of the photographs, the focus of the picture is on her genitalia, and three of these photographs are close-up views of her vagina and/or anus. After viewing the contents of the disc, Jackson's wife realized that Jackson had taken the photographs because she could see his arm and his watch. She then gave the disc to law enforcement.

**{¶8}** On January 19, 2005, Detective Michael Justice of the Union County Sheriff's Office interviewed Jackson at Ross Correctional Institution, where Jackson was incarcerated following his homicide conviction, regarding the photographs that his wife found. Jackson stated that he did not remember taking any nude photographs of his daughter and that he only asked his wife to destroy items that depicted him with an ex-girlfriend. When told by Det. Justice that his

daughter would have to be interviewed in order to determine who took the photographs, Jackson repeatedly stated that the detective did not have to do that.

{¶9}   On December 3, 2007, Jackson was indicted by the Union County grand jury for two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), both felonies of the third degree, one count of pandering sexually oriented matter involving a minor in violation of R.C. 2907.322(A)(1), a felony of the second degree, and one count of pandering sexually oriented matter involving a minor in violation of R.C. 2907.321(A)(1), also a felony of the second degree.

{¶10} Initially, Jackson entered pleas of not guilty on all four counts. However, on February 12, 2008, he also entered written pleas of not guilty by reason of insanity on all four counts.  That same day, counsel for Jackson filed a motion to determine Jackson's competency to stand trial.  A psychological evaluation was subsequently ordered.[3]   On August 7, 2008, the State filed a motion to amend count four of the indictment, stating that the Revised Code section and elements provided were accurate but that the name of the charge should be changed to pandering obscenity involving a minor.  The trial court granted this motion the following day.

{¶11} A jury trial was held in this matter on August 14-15, 2008.  During the trial, the State presented four witnesses, including Jackson's wife, Det. Ropp,

and Det. Justice. The State also presented the testimony of Dr. Mary Applegate, a board certified internist and pediatrician, who viewed the videotape and photographs in order to offer an opinion regarding Jackson's daughter's age at the time each was created as well as the basis for her opinion. The State also submitted a number of exhibits, including the videotape, the photographs, a transcript of Det. Justice's interview of Jackson, and the letter Jackson wrote to his wife asking her to burn the blue disc.

{¶12} At the conclusion of the State's case-in-chief, the defense presented its case, which included the testimony of two witnesses: 1) Dr. Daniel Hrinko, the forensic psychologist who evaluated Jackson to assess whether there was any evidence that Jackson suffered from a mental illness, disease, or defect, and if so, whether such condition resulted in an impairment in his ability to know the wrongfulness of his actions at the time of the instant offenses; and 2) Jackson, himself. The defense also submitted two exhibits, Dr. Hrinko's curriculum vitae and his written report of his evaluation of Jackson's mental state at the time the offenses were committed.

{¶13} Dr. Hrinko testified that the information presented to him, including Jackson's self-reporting, was consistent with a finding that Jackson did have a

---

[3] This portion of the motion was later withdrawn in open court and counsel for Jackson requested that the psychological evaluation previously ordered be limited to determining those issues attendant to a not guilty by reason of insanity plea.

serious mental disease that appeared to be consistent with a dissociative disorder, commonly referred to as "multiple personality disorder." However, Dr. Hrinko also testified that there is a split in the psychology field about whether this is a genuine disorder and that he, too, has his doubts about its legitimacy. Thus, he testified: "in spite of my doubts and concerns about the validity and the power I can give to a diagnosis such as dissociative disorder, I elected to make an assumption that if this were a genuine disorder and if [Jackson] did in fact suffer from this disorder, then I had to move to the next question, which was how did it affect his behavior around the time of the crime." Dr. Hrinko then concluded with a reasonable degree of psychological certainty that Jackson was able to know the wrongfulness of his actions at the time of the alleged offense and that there were no indications to suggest that any other mental disease or defect interfered with his ability to know the wrongfulness of his actions.

{¶14} Jackson testified as one of his personalities, a forty-year-old man named "Phillip." Jackson stated that "Phillip" has been in control of the physical body, known as Eric Anthony Jackson, for the last three years. He also testified the physical body has three "personalities" inside of it: Phillip, Eric, and Anthony, who is ten-years-old.[4] "Phillip" further testified that he first became aware of the multiple personalities when "Eric" was four-years-old because "Phillip," at the age

---

[4] At some points, this personality is identified as a nine-year-old, including in Dr. Hrinko's report of what Jackson told him, admitted as Defendant's Exhibit B.

of forty, was in control of a four-year-old's body. "Phillip" also stated that he was not aware of what the other personalities were doing when they were in control of "the body" and that he only remembers what he does when he is in control of "the body" and when he is talking to the other personalities. "Phillip" further testified that he did not remember anything from the time he left employment with Honda in 2000 until three days after he was arrested on October 15, 2002.

{¶15} In addition, he testified that "Anthony" was the one depicted in the video with his daughter and that any actions "Anthony" engaged in were experimental, as "Anthony" is only ten. However, he did acknowledge that the adult in the videotape is "the body" he occupies. "Phillip" also stated that the letters written to his wife, including the one asking her to burn the blue disc, were written by "Eric," not by "Phillip." During his testimony, "Phillip" further admitted that he did not mention his multiple personalities at any time prior to speaking with Dr. Hrinko after being indicted for the instant offenses, including when he spoke with another psychologist for his previous trial in 2003, when he testified at that trial in 2003, when Det. Justice interviewed him in January of 2005, or at any point during his twenty-year relationship with his wife.

{¶16} At the conclusion of the trial, the jury returned verdicts of guilty on all four counts. The trial court immediately proceeded to sentencing. The court sentenced Jackson to five years of imprisonment on each of the first two counts

and ordered that they be served consecutively to one another. The court also merged the third and fourth counts, the State elected to have Jackson sentenced on the third count, and the court sentenced Jackson to seven years in prison on that count. This count was also ordered to be served consecutively to the first two counts for an aggregate sentence of seventeen years. The trial court then ordered that the aggregate sentence of seventeen years be served consecutively to Jackson's previous sentence in his aggravated murder case. Lastly, the trial court informed Jackson of his classification as a Tier II sexual offender and of the registration requirements associated with that classification.

{¶17} This appeal followed, and Jackson now asserts two assignments of error.

### ASSIGNMENT OF ERROR I

**Mr. Jackson was denied a fair trial when the trial court admitted evidence of an unrelated prior conviction. Fifth and Fourteenth Amendments, United States Constitution; Section 16, Article I, Ohio Constitution. (Trial Transcript 8, 18, 23, 29, 61-63, 100, 110-11, 124).**

### ASSIGNMENT OF ERROR II

**Trial counsel provided ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution when he failed to object to or attempt to exclude evidence of Mr. Jackson's unrelated prior conviction. *Strickland v. Washington* (1984), 466 U.S. 668.**

*First Assignment of Error*

**{¶18}** In his first assignment of error, Jackson contends that the he was denied a fair trial because evidence of his prior conviction was improperly admitted. However, Jackson acknowledges that his trial counsel did not object to the admission of this evidence during the trial and that, consequently, this Court is limited to a review of this issue under the plain error standard. See *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163, 2001-Ohio-57; *State v. Gordon* (1971), 28 Ohio St.2d 45, 276 N.E.2d 243; *Holman v. Grandview Hosp. & Med. Ctr.* (1987), 37 Ohio App.3d 151, 157, 524 N.E.2d 903.

**{¶19}** In order to find plain error, there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must affect a defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68. Reversal on plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage" of justice. *Id*. Thus, it is within these constructs that we proceed to consider Jackson's first assignment of error.

**{¶20}** Jackson cites to seven pages in the trial transcript during the State's case-in-chief that he maintains contain inadmissible evidence. Our review of these pages reveals the following references to Jackson's prior case:

1) During the prosecutor's opening statement he described the contents of the videotape. After providing this description, the prosecutor states:

**Ladies and gentlemen, after that, the tape ends. You will learn that this tape was found when this detective was conducting *another investigation*. It was seized. They looked at the tape and discovered what was on that tape. The detective can tell you that in 2002 where [*sic*] they moved here in Marysville and *when he was arrested on 10-15-2002*, that girl was eight years old, maybe up to nine.**

(Trial Trans., p. 8.) (emphasis added);

2) During the direct testimony of Det. Ropp, the following line of questioning occurred regarding how Det. Ropp came into possession of the videotape:

**Q. And can you tell the jury, if you would, please, how you became involved in this investigation.**

**A. We were involved *in an investigation of Mr. Jackson on his actions on 10-15-2002* here in the City of Marysville.**

**Q. Sir, when you became involved in this investigation, the, Mr. Jackson at that time, *was he placed in custody*?**

**A. *He was*.**

**Q. And was he found – where was he located?**

**A. He was located I believe just outside of the city limits by Deputy Lonnie Elmore in his motor – in his personal motor vehicle.**

**Q. And was that motor vehicle seized?**

**A. Yes, it was.**

(id. at pp. 18-19.) (emphasis added);

3) Later in Det. Ropp's direct examination the following line of questioning also occurred regarding where the videotape was filmed:

**Q. Sir, had you been in that master bedroom at 156 Riverwind?**

**A. Yes, I have.**

**Q. And pursuant to how – what authority did you view that room?**

**A. *Pursuant to a search warrant relating to the case involving Mr. Jackson on 10-15-02.***

(id. at p. 23.) (emphasis added);

4) During the direct testimony of Jackson's wife, the following line of questioning occurred regarding the biological relationship between the victim and Jackson:

**Q. And your daughter is [the victim]?**

**A. Yes.**

**Q. How old – well, strike that. At the time that you were with Mr. Jackson, Mr. Jackson thought that he was [the victim's] father.**

**A. Correct.**

**Q. It wasn't until *after his arrest* that you told him that he was not; is that right?**

**A.   Right.**

(id. at pp. 28-29.) (emphasis added); and

5)   Lastly, during the direct testimony of Det. Justice, the following line of questioning occurred regarding Jackson's interview with Det. Justice while he was in prison:

**Q.   Sir, I'm handing you what's marked for identification purposes as State's Exhibit 10.   Can you identify that for the Court and the jury, please?**

**A.   That is a transcript of the interview, *which had* [*sic*] *recorded on a digital recorder at Ross Correctional with Eric Jackson*.**

**\* \* \***

**Q.   Sir, in this interview, did you – you were inquiring about the photographs, were you not?**

**A.   Yes, sir.**

**Q.   And generally speaking, what did Mr. Jackson tell you about the photographs that you were talking about?**

**A.   Generally, I explained to him that if there's not a confession or admission to him taking the photographs that his daughter would have to be interviewed as to who took the photographs, and he basically alluded that there's no reason to interview her, *if additional cases could be put together for another type of sentence that he was currently incarcerated in*, and had other discussion.   He brought up a couple different things about the videotape.**

**\* \* \***

**Q. Sir, when you asked him about the photographs, he indicated he didn't remember taking the photographs?**

**A. That is correct.**

**Q. Page 7, then, line 13 [referring to State's Exhibit 10], what did he tell you his situation was at that time?**

**A. He stated "I was on enough pills at that time that I don't remember taking the pills. I know I wasn't like that with her. She doesn't need to see the pictures. *I'm doing enough time to where it is right now trying to get this other case straightened around*."**

(id. at pp. 61-63.) (emphasis added).

**{¶21}** Jackson also asserts that once the State introduced this evidence, then he mentioned his prior conviction during his testimony. This testimony consisted of the following:

1) At the beginning of his direct testimony, Jackson stated that he did not recall the period of his life from 2001-2002. In discussing this, the following questioning occurred:

**Q. Let's back up. What was the first time – from today's date backwards, what is the first date that you do recall?**

**A. First date that I remember is three days *after being arrested for being accused of point blank shooting my mother*.**

**Q. Was that around the same time as – as this supposed incident?**

**A. That was in October, and suggestibly [*sic*] this happened in either July or prior to July to January.**

Case No. 14-09-30

(Trial Trans., p. 100.) (emphasis added);

   2)   During cross-examination by the prosecutor regarding whether Jackson did not, in fact, recall the year 2001, his stated reason, both at trial and to Dr. Hrinko, for leaving his employment with Honda, and whether he previously revealed that he had multiple personalities, the following line of questioning occurred:

   **Q.   In fact, though,** *you gave testimony at a prior trial, did you not***?**

   **A.   *Yeah*.**

   **Q.   And at that time you said you left because of back pain. Right?**

   **A.   I was let go because –**

   **Q.   I'm sorry, sir, I didn't ask you about why you were let go.  *I asked you about your prior testimony.  At that time you testified* it was because of back pain, didn't you?**

   **A.   Yes.**

   **Q.   And, sir, *in your prior testimony, which was in a prior trial; is that right*?  You remember that?**

   **A.   Do you want to –**

   **Q.   I'm sorry, 2003, June 25th, 2003.   *Do you remember testifying*?**

   **A.   No, I don't.**

**Q. So you don't remember that *during that testimony* you said absolutely nothing [about] having multiple personalities, right? Sir, isn't that right?**

**A. Yes, it is.**

**Q. And, in fact, you didn't come up with this multiple personality idea until after *you had already been on trial*. Never said a word about it, did you, sir?**

**A. The blackouts and everything –**

**Q. I'm sorry, sir. You never said a word about multiple personalities, did you?**

**A. Because Eric didn't want to get locked up in a mental institution.**

**Q. And, sir, *you're already locked up then*, and then you talked to Detective Justice, didn't you? Do you remember talking to Detective Justice on 1-19-2005?**

**A. Yes, I do.**

**Q. And at that time you never said anything about multiple personalities, did you, sir?**

**A. No, I didn't.**

**Q. So *when you testified before* you said nothing about multiple personalities.**

**A. Uh-huh.**

(id. at pp. 110-111.) (emphasis added); and

3) In his redirect-examination, the following line of questioning occurred regarding Jackson's previous testimony and about the blackouts that he maintained he experiences:

**Q. Eric, Mr. Phillips has asked you a couple times regarding *your testimony at your first trial*. Why didn't you bring up your multiple personalities at your first trial?**

**A. Because Eric didn't want to be locked away in an insane asylum for the rest of his life.**

**Q. And *in your first trial*, who was there testifying?**

**A. That was Eric.**

**Q. Are you still experiencing blackouts?**

**A. Yes, I am.**

**Q. How often?**

**A. Not very often. For about the last three years I've had three blackouts for no more than two days at a time.**

**Q. Did you make anybody aware at the – *at the prison* of these blackouts?**

**A. No, I haven't.**

(id. at p. 124.) (emphasis added).

{¶22} Jackson maintains that evidence of his previous conviction was not admissible for four reasons: 1) pursuant to Evid.R. 401 and 402, it was not relevant; 2) pursuant to Evid.R. 403(A), even if relevant, its probative value was substantially outweighed by the danger of unfair prejudice; 3) pursuant to Evid.R.

-18-

404(B), this evidence of his prior bad acts, was not admitted for any permissible purpose such as motive, opportunity, or intent; and 4) pursuant to Evid.R. 609(A), it was not introduced to impeach him because it was introduced in the state's case-in-chief rather than during his testimony.

{¶23} With certain exceptions, "[a]ll relevant evidence is admissible." Evid.R. 402. However, "[e]vidence which is not relevant is not admissible." Id. In defining what is relevant, Evid.R. 401(A) states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Ohio Supreme Court has repeatedly held that "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Trimble*, 122 Ohio St.3d 297, 911 N.E.2d 242, 2009-Ohio-2961, at ¶ 104, citing *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus.

{¶24} Nevertheless, as previously noted, there are restrictions on the admission of relevant evidence. Among these restrictions is evidence that has a probative value that "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Also, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Similarly, R.C. 2945.59 states:

> **In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.**

{¶25} The Ohio Supreme Court has discussed the underlying rationale for the limited admissibility of other acts evidence as follows:

> **The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment. See State v. Curry (1975), 43 Ohio St.2d 66, 68, 330 N.E.2d 720, 723. This danger is particularly high when the other acts are very similar to the charged offense, or of an inflammatory nature[.]**

*State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 1992-Ohio-31. Furthermore, "evidence of prior convictions is prohibited except under narrow circumstances." *Trimble*, 2009-Ohio-2961, at ¶ 172, citing *State v. Allen* (1987), 29 Ohio St.3d 53, 55, 506 N.E.2d 199. One such circumstance is for impeachment purposes when a defendant testifies. Specifically, "evidence that the accused has

been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year * * * and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 609(A)(2).

{¶26} Initially, we note that the State never attempted to impeach Jackson's credibility through the use of his prior conviction. Rather, the evidence that is the subject of this appeal was largely introduced in the State's case-in-chief. Further, the evidence that was used to attempt to impeach Jackson was in the form of questions during the cross-examination of Jackson about the testimony he gave in his prior trial. Thus, Evid.R. 609 does not apply.

{¶27} We also note that the prosecution did not present any direct evidence that Jackson had a prior conviction and/or the name of the crime for which Jackson was convicted, i.e. aggravated murder with a firearm specification. Moreover, the State did not ask Jackson any questions about his prior conviction. Instead, as previously detailed, the majority of the evidence that is the subject of this appeal involves statements about Jackson's "arrest" on October 15, 2002, and "another investigation" of Jackson relating to that arrest. However, Det. Justice's testimony included a statement that he interviewed Jackson at Ross Correctional (a prison) and that Jackson talked about cases being put together for another type of sentence than what he was currently incarcerated for and that he was "doing

enough time" and needed to get his "other case straightened around." This information certainly implied that Jackson was in prison for some sort of crime, i.e. that he had a prior conviction. Thus, we proceed to analyze this evidence with an understanding of the substantial danger that evidence of a prior conviction presents.

{¶28} In regards to the relevancy of the evidence to which Jackson now objects, we note that the age of Jackson's daughter at the time of the offenses was an element in all four counts. More specifically, R.C. 2907.05(A)(4) requires that the victim be under the age of thirteen, and R.C. 2907.321(A)(1) and R.C. 2907.322(A)(1) require that the victim be a minor, which is defined as a person under the age of eighteen, see, R.C. 2907.01(M). Furthermore, the State also had to prove the dates of these alleged offenses, all four of which were alleged to have occurred between July 1, 2001, and October 14, 2002. Thus, the fact that Jackson was arrested on October 15, 2002, that his vehicle was seized, and that the videotape was discovered when the vehicle was processed for evidence were all relevant to establish a time frame for the making of the videotape and to determine his daughter's age at that time, as the videotape was undated.

{¶29} The next question is whether this evidence, nevertheless, was inadmissible as other acts evidence. We find that none of this evidence was *inextricably* related to the crimes charged in the indictment. See *State v. Lytle*

(1976), 48 Ohio St.2d 391, 403, 358 N.E.2d 623, judgment vacated as to the imposition of the death penalty based on the unconstitutionality of Ohio's then-death penalty scheme by *Lytle v. Ohio* (1978), 438 U.S. 910, 98 S.Ct. 3135. To the contrary, the State could have presented evidence that the tape was found by law enforcement in Jackson's vehicle along with Jackson, himself, as a result of an unrelated investigation without reference to his "arrest" being made. Moreover, evidence of his arrest served none of the purposes provided by Evid.R. 404(B) and R.C. 2945.59 such as proof of motive, intent, scheme, or plan. Thus, this evidence should not have been introduced.

{¶30} The State also had to prove that the offense occurred in Union County. Therefore, Det. Ropp's testimony that the video was filmed in Jackson's bedroom in his Marysville home and how Det. Ropp would have knowledge of this (having been in the home) was also relevant. However, the jury only needed to know that Det. Ropp was familiar with the bedroom because he had actually been in that room in 2002. Although whether Det. Ropp was in Jackson's home in a lawful manner is a relevant inquiry, the fact that Det. Ropp was there *pursuant to a search warrant relating to the October 15, 2002 investigation of Jackson* was not relevant and should not have been introduced. Further, Det. Ropp's testimony that the portion of the videotape at issue was filmed in the bedroom was corroborated by Jackson's wife, who shared that bedroom with Jackson.

Therefore, evidence of the search warrant was an unnecessary inclusion of evidence related to other criminal acts.

**{¶31}** Also, Jackson's attempts during his interview with Det. Justice to keep Det. Justice from interviewing the victim so that she could possibly tell him who photographed her in those positions was relevant for purposes such as consciousness of guilt. Therefore, this information was relevant and was properly introduced. However, the location of the interview and Jackson's references to serving time on another case were not relevant. In addition, that evidence could have readily been redacted from the transcript of the interview and omitted from Det. Justice's testimony. Therefore, that evidence was not proper.

**{¶32}** As for the prosecutor's cross-examination of Jackson regarding the testimony he gave in his trial and how he failed to mention that he has multiple personalities at that time, this evidence was also relevant to challenge Jackson's recent claim that he suffers from this disorder. Evidence Rule 607 permits a witness' credibility to be attacked, including by a prior inconsistent statement. Although Jackson's testimony in the case sub judice was not a direct contradiction of his previous testimony, a failure to mention such a purportedly serious disorder is highly relevant to the credibility of Jackson's claim, particularly when Jackson testified that he was suffering from this disorder at the time both the instant offenses and the murder of his mother occurred.

**{¶33}** This evidence was also relevant as to his claims that "Anthony", the ten-year-old, was experimenting rather than acting as one who would have knowledge of the character of the material or performance portrayed in the videotape and photographs, which is an element of both pandering charges, see R.C. 2907.321(A)(1), 2907.322(A)(1), or engaged in the activity for the purpose of sexual arousal or gratification, which is an element of gross sexual imposition, see R.C. 2907.05(A)(4). Thus, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury and was admissible.

**{¶34}** Turning to Jackson's statements about his prior conviction during his direct testimony, the State's evidence did not necessitate him testifying in this manner. To the contrary, Jackson's attorney asked him what the first *date* that he could recall was. Jackson chose to answer that question by responding, "three days after being arrested for being accused of point blank shooting my mother." In light of the testimony in the State's case-in-chief, Jackson could have limited his response to the date being three days after his arrest or actually provided the date of October 18, 2002. Accordingly, Jackson, himself, invited this error and may not prevail on this particular issue on appeal. See *State ex rel. Bitter v. Missig*, 72 Ohio St.3d 249, 254, 648 N.E.2d 1355, 1995-Ohio-147.

{¶35} Having determined that portions of the evidence now challenged by Jackson should not have been admitted, we must next determine whether a reversal of the jury's verdicts is necessary to prevent a manifest miscarriage of justice. We find that nothing in the record suggests that the jury used the improper evidence to convict Jackson. Rather, the evidence previously discussed is overwhelming against Jackson. Undeniably, Jackson created the video in which he is seen having sexual contact with his daughter, who is quite clearly under the age of thirteen. The date the video was seized is undisputed; Jackson's daughter was only eight-years-old on that date.

{¶36} The photos also had to have been taken before Jackson's arrest, and the JPEG file in which they were located shows a date of July 1, 2001, when his daughter was six. Jackson's wife recognized his arm and his watch in those photographs, and she was not aware that these photographs were in existence until Jackson specifically asked her to burn the disc labeled "Jams." Not only did he ask her to destroy that disc, but he informed her that the disc had pictures on it that she did not want to see and that "the explanation sickens me anyway." Notably, this disc was in a footlocker belonging to his wife, yet Jackson was the one who knew where the keys to it were, not her. In short, the videotape and photographs speak for themselves.

**{¶37}** Moreover, Jackson's attempt to be found not guilty by reason of insanity further undermined his case. The psychologist who examined him testified that dissociative disorder was questioned by half of the experts in the field of psychology and then proceeded to opine with a reasonable degree of psychological certainty that even if this were a legitimate disorder, that Jackson's representations to him were accurate, and that Jackson suffered from this disorder, Jackson and all of his purported personalities were able to know the wrongfulness of his (their) actions at the time of the offenses and there was no indication to suggest that this disorder interfered with his (their) ability to know the wrongfulness of those actions. Finally, Jackson's own testimony that he never told anyone that he suffered from multiple personalities despite being on trial for the shooting of his mother also detracted from any credibility he may have had, particularly when coupled with the testimony of his wife that they had been together as a couple for approximately twenty years and that she had never suspected he suffered from any mental condition.

**{¶38}** From the record in this case, we find no reasonable possibility that the improperly admitted evidence might have contributed to Jackson's conviction or that a reversal is necessary to prevent a manifest miscarriage of justice. Therefore, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶39}** In his second assignment of error, Jackson maintains that his trial counsel was ineffective for failing to file a motion in limine or otherwise object to the admission of the evidence at issue in the first assignment of error. Our review of this issue begins by noting that attorneys licensed by the State of Ohio are presumed to provide competent representation. *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149. An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. In reviewing such a claim, courts are to afford a high level of deference to the performance of trial counsel. *Id*. at 142, 538 N.E.2d 373. Also, in order to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id*. at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 142, 538 N.E.2d 373.

**{¶40}** Given our discussion as to the first assignment of error and the overwhelming evidence against Jackson, we need not determine whether counsel's performance fell below objective standards of reasonable representation, as no reasonable probability exists that, but for, any perceived errors, the outcome at

trial would have been different. Accordingly, the second assignment of error is overruled.

{¶41} For these reasons, the judgment of the Common Pleas Court of Union County, Ohio, is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and ROGERS, J., concur.**

**/jlr**